**UNION PACIFIC RAILROAD COMPANY, Southern Pacific Transportation Company, Burlington Northern and Santa Fe Railway Company, Plaintiffs–Appellants,**

**and**

**Brotherhood of Locomotive Engineers, United Transportation Union, Intervenors,**

**v.**

**CALIFORNIA PUBLIC UTILITIES COMMISSION, P. Gregory Conlon, Jessie J. Knight, Henry M. Duque, Josiah L. Neeper, Richard A. Bilas,**

Commissioners of the California Public Utilities Commission, in their individual capacities, Defendants–Appellees.

Union Pacific Railroad Company, Southern Pacific Transportation Company, Burlington Northern and Santa Fe Railway Company, Plaintiffs–Appellees,

and

Brotherhood of Locomotive Engineers; United Transportation Union, Intervenors,

v.

California Public Utilities Commission, Defendant–Appellant,

and

P. Gregory Conlon, Jessie J. Knight, Henry M. Duque, Josiah L. Neeper, Richard A. Bilas, Commissioners of the California Public Utilities Commission, in their individual capacities, Defendants.

Nos. 01–15141, 01–15531.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 2003.

Filed June 17, 2003.

Maureen E. Mahoney, Latham & Watkins, Washington, D.C., argued the cause for the plaintiffs-appellants-cross-appellees and filed briefs; William S. Carnell, Latham & Watkins, Washington, D.C., Carol A. Harris, Union Pacific Railroad Company, San Francisco, CA, and Richard E. Weicher and Ward D. Werner, The Burlington Northern & Santa Fe Railway Company, Fort Worth, TX, were on the briefs.

Patrick S. Berdge, Public Utilities Commission of the State of California, San Francisco, CA, argued the cause for the defendants-appellees-cross-appellants and filed briefs; Gary M. Cohen and Ellen S. Levine, Public Utilities Commission of the State of California, San Francisco, CA, were on the briefs.

Lawrence M. Mann, Alper & Mann, Washington, D.C., argued the cause for the intervenors United Transportation Union and Brotherhood of Locomotive Engineers, and filed a brief.

Irene M. Solet, Attorney, Appellate Staff Civil Division, Department of Justice, Washington, D.C., argued the cause for the amicus curiae, United States, and filed briefs; Kirk K. Van Tine, General Counsel, Rosalind A. Knapp, Acting General Counsel, Paul Geier, Assistant Attorney General Counsel, and Paul Smith, Senior Trial Attorney, Department of Transportation, Washington, D.C., S. Mark Lindsey, Chief Counsel, Daniel C. Smith, Assistant Chief Counsel, and Colleen Brennan, Trial Attorney, Federal Railroad Administration, Washington, D.C., and Robert D. McCallum, Jr., Assistant Attorney General, Stuart E. Schiffer, Acting Assistant Attorney General, Robert S. Mueller, III, United States Attorney, David W. Shapiro, United States Attorney, and Douglas Letter, Attorney, Appellate Staff Civil Division, Department of Justice, Washington, D.C., were on the briefs.

Before CANBY, O'SCANNLAIN, and W. FLETCHER, Circuit Judges.

## OPINION

O'SCANNLAIN, Circuit Judge.

We must decide whether California's regulations governing railroad track standards and internal railroad rules, which were adopted in response to train derailments within the state, are preempted by federal railroad safety laws or regulations.

I

On July 14, 1991, a train operated by the Southern Pacific Transportation Company derailed at the Cantara Loop near Dun-

smuir, California and spilled metam sodium into the Sacramento River. The metam sodium killed fish and vegetation along the river for forty miles and caused wide-spread health problems for area residents. Two weeks later, a Southern Pacific train was also involved in another toxic spill resulting from a derailment near Seacliff, California.

The California legislature responded to these accidents by directing the California Public Utilities Commission ("CPUC") to identify "local safety hazard[s]" on California's railways and to adopt regulations "to reduce the potential railroad hazards" at those sites. Cal. Pub. Util.Code §§ 7711, 7712. CPUC was directed to consider factors such as (1) the severity of the grade and curve, (2) the value of special skills of train operators in negotiating such sites, (3) the value of special railroad equipment in negotiating the rail segment, (4) the types of commodities transported on the segment, (5) the hazard posed by the release of the commodity into the environment, (6) the proximity of railroad activity to human activity or sensitive environmental areas, and (7) the history of accidents at or near hazard sites. *Id.* § 7711(d), (e).

CPUC was further directed to consider "[e]stablishing special train operating standards for trains operated over railroad sites identified as posing a local safety hazard." *Id.* § 7712(c). Specifically, CPUC was required to consider standards governing "the length, weight, and weight distribution" of trains and "special training, personnel and performance standards for operators of trains" that travel on the identified sites. *Id.* § 7712(c), (d).

In August 1991, CPUC ordered an investigation into the Dunsmuir and Seacliff derailments. In December 1994, CPUC issued its decision regarding the derailment, which found the Cantara Loop to be a "local safety hazard." CPUC concluded that the derailment was caused by track-train dynamics ("TTD") and the configuration of the train cars. In this case, light empty railcars were placed at the head-end of the train on a severe grade and curve combination. *In re S. Pac. Transp. Co.*, 57 CPUC 2d 386, 400–01 (Nov. 22, 1994). The light railcars were pulled off the inside radius of the Cantara Loop by the heavier loaded railcars behind them causing the train to derail. *Id.* CPUC concluded that the railroad "knew or should have known" of the likelihood of derailment due to the unsafe configuration. *Id.* The railroad, however, was not in violation of any FRA rules or of its own internal TTD rules, and accordingly, no disciplinary action was taken against it. *Id.* at 404.

Following the California legislature's direction, CPUC also issued an order in March 1992 instituting an investigation into all potential railroad safety hazards in California. CPUC issued a final order in 1997 identifying nineteen sites located in California mountains as local safety hazards [1] and adopting regulations governing operations at thirteen of these sites. *See* Rulemaking on Comm'ns Own Motion to Provide for Mitigation of Local Rail Safety Hazards within California, 75 CPUC 2d 1, 120–43, *available at* 1997 WL 616304 (Sept. 3, 1997) (hereinafter "1997 CPUC Rulemaking"). CPUC's order required the Railroads: (1) to cooperate in developing performance-based standards for train configuration based on TTD; (2) to develop standards for dynamic braking systems;

---

**1.** These nineteen sites encompass approximately 4.2% of all the track in the state. Rulemaking on Comm'ns Own Motion to Provide for Mitigation of Local Rail Safety Hazards within California, 75 CPUC 2d 1, 5, *available at* 1997 WL 616304 (Sept. 3, 1997 Cal. Pub. Util. Comm'n).

(3) to equip trains with two-way end-of-train telemetry devices; (4) to institute new training programs; (5) to install more hot bearing trackside defect detectors; (6) to adopt heightened standards for securing standing trains; (7) to maintain current track strength at one particular site; and (8) not to discipline railroad employees who report violations of the new regulation. *Id.* at 168–73. According to CPUC, these rules were enacted "out of sheer necessity to protect California's people, its environment and its commerce against the disastrous consequences of recent rail accidents and toxic spills." *Id.* at 2.

On October 9, 1997, Union Pacific Railroad, Southern Pacific Transportation Company,[2] and Burlington Northern & Santa Fe Railway Company (collectively "the Railroads") sued to enjoin some of the regulations contending that they were preempted by, among other laws, the Federal Railroad Safety Act ("FRSA"), the Locomotive Boiler Inspection Act ("LBIA"), or the Safety Appliance Act ("SAA"), and that they impermissibly burdened interstate commerce. The United Transportation Union and Brotherhood of Locomotive Engineers (collectively "the Unions") intervened as party defendants.[3]

The district court granted the Railroads' motion for a preliminary injunction in part on November 26, 1997. We affirmed the grant on September 4, 1998, without resolving the merits of the underlying legal challenges. *See Union Pac. R.R. v. Cal. Pub. Utils. Comm'n,* 161 F.3d 16, 1998 WL 613794, at *3 (9th Cir. Sept. 4, 1998) 1998 U.S.App. LEXIS 22118.

On July 20, 2000, the district court, in a memorandum and order that were later amended, granted both parties' motions for summary judgment in part.[4] The court concluded that the following CPUC rules were preempted:[5] (1) rule requiring the Railroads to cooperate in the development and implementation of performance-based train make-up standards for sites 1, 3, 4, 7, 9, 12, 16, 22, 23, 26, 28, 29, and 31;[6] (2) rule requiring the Railroads to obtain

---

**2.** Since the case's inception Union Pacific has acquired Southern Pacific. *See* Appellants' Opening Brief at 3 n. 1.

**3.** Several environmental groups, Friends of the River, California Sport-fishing Protection Alliance, Sacramento River Preservation Trust, and United Anglers, also collectively intervened as party defendants in the district court. We granted their motion to withdraw as parties and thus they were not involved with this appeal.

**4.** In a previous decision, on December 14, 1998, the district court held that (1) Cal. Pub. Util.Code § 7672.5 is not preempted by the Hazardous Materials Transportation Act ("HMTA") or the FRSA, and that (2) Cal. Pub. Util.Code § 7673(c) is preempted by the HMTA. *Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm.,* No. C97–3660, at 15(N.D.Cal. Dec. 14, 1998) (order on motion for reconsideration). It also reconfirmed an earlier decision that Cal. Pub. Util.Code § 7672(b)-(c) is preempted by the HMTA. *Id.* The parties did

not appeal this determination and do not challenge these rulings here.

**5.** The district court also found the following rules preempted, although CPUC did not appeal this portion of the district court's ruling: (1) rule requiring that all trains operating over sites 6 and 25 utilize a two-way-end-of-train telemetry device; (2) rule requiring the Railroads to cooperate in the development and implementation of new standards for dynamic brakes based on total train braking performance criteria; and (3) rule requiring implementation of state-approved locomotive maintenance program. *Union Pac. R.R. v. Cal. Pub. Utils. Comm'n.,* 109 F.Supp.2d 1186, 1218–19 (N.D.Cal.2000)

**6.** The district court amended its memorandum and order on December 19, 2000. Originally, the district court held that the CPUC rules governing only 7 of the 13 sites were preempted; the December 19 amendment concluded that the CPUC rule governing all 13 sites was preempted.

CPUC approval prior to making changes to their own internal TTD rules; and (3) rule requiring separate training program for train make-up rules. *Union Pac. R.R. v. Cal. Pub. Utils. Comm'n.*, 109 F.Supp.2d 1186, 1218–19 (N.D.Cal.2000). The court held the following CPUC rules were not preempted:[7] (1) rule requiring the Railroads to comply with their own train make-up rules at sites 1, 3, 4, 7, 9, 12, 16, 22, 23, 26, 28, 29, 31; and (2) rule governing track standards at site 9, a ten-mile stretch of track which includes the Cantara Loop, the site of the 1991 derailment. *Id.* at 1219.

After the district court amended its memorandum and order on December 20, 2000, the Railroads filed a timely notice of appeal. CPUC filed a motion for reconsideration, which was denied on March 14, 2001. Shortly thereafter, the CPUC filed its timely notice of appeal. As amicus curiae, the United States of America, on behalf of the U.S. Department of Transportation ("DOT") and the Federal Railroad Administration ("FRA") filed briefs supporting the Railroads in part and CPUC in part.

## II

The FRSA was passed in 1970 as a supplement to the SAA and LBIA "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101; *accord CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 661, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). The FRSA delegates to the Secretary of Transportation the au-

thority to "prescribe regulations and issue orders for every area of railroad safety supplementing laws and regulations in effect on October 16, 1970."[8] 49 U.S.C. § 20103(a).

The FRSA provides that the rules regulating railroad safety "shall be nationally uniform to the extent practicable," and expressly preempts state authority to adopt safety rules, save for two exceptions. *Id.* § 20106. States are permitted to adopt railroad regulations if the Secretary of Transportation has not "prescribe[d] a regulation or issue[d] an order covering the subject matter of the State requirement." *Id.* Alternatively, if the DOT has "cover[ed]" the subject matter,

> A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order (1) is necessary to eliminate or reduce an essentially local safety ... hazard; (2) is not incompatible with a law, regulation, or order of the United States Government; and (3) does not unreasonably burden interstate commerce.

*Id.* Both of these exceptions to preemption are at issue in this appeal.

### A

The Railroads first challenge the district court's determination that CPUC's rule regarding track strength for a ten-mile segment of track near Dunsmuir, California ("Site 9") was not preempted, *i.e.*, they contend that it was not an "essentially local safety hazard." The CPUC regula-

---

**7.** The district court also found that CPUC's rule requiring that at least one hot bearing trackside defect detector be installed at site 25 was not preempted. *Union Pac. R.R.*, 109 F.Supp.2d at 1219. The Railroads did not appeal the district court's ruling on this issue.

**8.** The Secretary of Transportation has delegated authority to enact regulations pertaining to railroad safety to the FRA. *See Mich. S. R.R. Co. v. City of Kendallville*, 251 F.3d 1152, 1154 (7th Cir.2001) ("Regulations [under the FRSA] are promulgated and enforced by the Federal Railroad Administration.").

tion at issue requires the Railroads to maintain improvements they made to the track strength, which are above minimum federal levels, and to obtain CPUC approval for any change. *See* 1997 CPUC Rulemaking, *supra, available at* 1997 WL 616304.

There is no dispute that the FRA has issued regulations covering track strength. *See* 49 C.F.R. pt. 213(setting forth minimum federal track safety standards). The Railroads' appeal centers on the FRSA's second savings clause: whether the state may enforce a more stringent regulation than what is currently required under federal law. As noted above, to be valid, the regulation must be "necessary to reduce or eliminate an essentially local safety hazard," be compatible with federal law, and not "unreasonably burden interstate commerce." 49 U.S.C. § 20106.

The Railroads contend that the district court applied the wrong standard to determine what constitutes an "essentially local safety hazard." In arriving at its definition, which CPUC and the Unions support, the district court first concluded that the modifier "essentially" was significant. *Union Pac. R.R.,* 109 F.Supp.2d at 1203. Instead of requiring a "uniquely" local safety hazard, as the railroad industry had suggested during the drafting of the FRSA, Congress adopted the modifier "essentially," thus implying that it need not be unique to that locale. *Id.* 1203–04. More-

over, the district court noted that while national uniformity is an important objective of the FRSA, railroad safety is the primary concern. *Id.* at 1204.

The district court held that the combination of a 14 percent curve, the sharpest main line track curve in California, and a steep grade [9] make Site 9 ripe for danger.[10] *Id.* at 1206. The grade-curve combination is most hazardous on a bridge that crosses the Sacramento River, the same river that was devastated by the 1991 derailment, and "[t]he severity of the environmental risk from future accidents [at this site] can only be described as enormous." *Id.* The court held that although the grade-curve combination may not be unique because there are sharper curves in other mountainous states (*e.g.,* a 16 percent curve in Colorado and a 14 percent curve in Idaho), Site 9 was "essentially a local safety hazard" because it "exhibit[ed] a combination of peculiar or distinctive features or characteristics (including environmental or demographic features) that are neither typical nor common or otherwise 'state-wide' in nature, and which create a safety hazard." *Id.*

1

The definition of an "essentially local safety hazard" is a question of first impression in this circuit. While we agree with the district court that a hazard need

9. After the 1991 accident, the grade was changed from 2.28 degrees to less than 1 percent. *Union Pac. R.R.,* 109 F.Supp.2d at 1206 n. 26. Since 1991, there have been no accidents at the site.

10. Trains derail here at "a rate eight times higher than that on the rest of this line." 1997 CPUC Rulemaking, *supra,* at 127, *available at* 1997 WL 616304. The chances for such a random number of derailments at this site is "less than 1 in a trillion." *Id.* The

Railroads do not dispute the calculations, but argue that CPUC is looking at the wrong data. The historical rate is no longer accurate given the changes to the track structure and the absence of derailments since 1991; CPUC in issuing its orders considered only derailment rates between 1976 and 1991. *Id.* at 35 n. 36. Because the methodology used by CPUC does not affect our ultimate conclusion, we need not decide whether CPUC's calculations were indeed faulty.

not be unique to be "essentially local,"[11] we do not agree that the modifier "essentially" is as broad as the district court reads it to be. Rather than relying solely on the frequency with which a hazard occurs, as the district court held, we conclude that the word "essentially" requires us to inquire into the nature of the hazard itself to determine whether it is the type of hazard that is properly dealt with on a local level. *See Burlington N. & Santa Fe Ry. v. Doyle,* 186 F.3d 790, 795 (7th Cir. 1999) (Congress intended the exception to apply to "safety concerns of a local rather than national character."); Webster's Third New Int'l Dictionary 777 (1986) (defining "essentially," in relevant part, as that which is "fundamental"). *Cf. S. Pac. Co. v. Arizona,* 325 U.S. 761, 767, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (stating in a another context that "matters of local concern" are those, "which, because of their number and diversity, may never be adequately dealt with by Congress"). Thus, the frequency of occurrence within the state, while relevant, is not dispositive.

■ Our sister circuits, which have plumbed the statutory history of the FRSA, have come to a similar conclusion and have created a workable definition of an "essentially local safety hazard," defining it as one which is not "adequately encompassed within national uniform standards." *See, e.g., Nat'l Ass'n of Regulatory Util. Comm'rs v. Coleman,* 542 F.2d 11, 14–15 (3d Cir.1976) ("The exception was designed instead to enable the states to respond to local situations which are not

statewide in character and not capable of being adequately encompassed within national uniform standards."); *Norfolk & W. Ry. v. Pub. Utils. Comm'n,* 926 F.2d 567, 571 (6th Cir.1991) ("[T]he second exception . . . permits state regulation only when local situations are 'not capable of being adequately encompassed within uniform national standards.' "); *see also, e.g., Burlington N. R.R. v. Montana,* 805 F.Supp. 1522, 1528 (D.Mont.1992) (adopting definition from *Nat'l Ass'n of Regulatory Util. Comm'rs,* 542 F.2d at 14–15); *Union Pac. R.R. v. Pub. Util. Comm'n,* 723 F.Supp. 526, 530 (D.Or.1989) ("PUCO's permanent regulations do not address essentially local safety hazards because the permanent regulations are statewide in character and capable of being addressed adequately in uniform national standards."). Such definition provides an accurate inquiry, and we adopt it.

### 2

■ Having determined the relevant test, we now turn to whether the safety hazard at issue in this case is one that is "essentially local." CPUC contends that Site 9 is a local safety hazard because of the abnormally high derailment rate at the site and its steep grade/sharp curve combination. We conclude these factors are not sufficiently local to fall within the "essentially local safety hazard" exception.

First, the high derailment rate is, itself, unremarkable: all steep grades and sharp curves increase the risk for derailment. *See, e.g.,* Declaration of Scott M. Dennis in

11. The Railroads contend that the Supreme Court's opinion in *Easterwood* requires an "essentially local safety hazard" to be a hazard unique to a locality. While the Court did note that the state's common law of negligence is not an "essentially local safety hazard" because it "address[es] all hazards caused by lack of due care, not just those owing to unique local conditions," *Easter-wood,* 507 U.S. at 675, 113 S.Ct. 1732, the Railroads overstate the importance of the Court's phrasing. In context, the Court was stating the uncontroversial notion that hazards which are statewide are not local safety hazards, nothing more. We decline to ascribe to the Court the intention to define precisely an "essentially local safety hazard" without any discussion.

Support of Plaintiffs' Motion for Summary Judgment 6, 8–9 (Dec. 14, 1999) (noting that heavy grade sites often have elevated derailment rates); Fed. R.R. Admin., U.S. Dep't of Transp., Report to Senate Committee on Commerce, Science, and Transportation and the House Committee on Energy and Commerce, Forward through the 90s: Selected Issues in the Transportation by Rail of Hazardous Materials 6 (Sept.1994) (hereinafter "FRA, Forward through the 90s") (acknowledging that "[r]ail lines in difficult terrain, which can have severe grades and curves, present operating difficulties and dangers greater than rail lines on relatively easy terrain" which can "cause potentially dangerous derailments"). Because Site 9 contains the highest steep grade/sharp curve combination in the state, one would also expect that it would have a correspondingly high historical derailment rate.

Moreover, although a high derailment rate may be evidence of an existing hazard, it says nothing about the nature of the hazard itself. Once the federal government has covered the subject matter, as it has done here, states have authority only over those hazards which are "essentially local." The character of the grade/curve combination at issue here does not meet the definition of an "essentially local safety hazard." There are many curves in the United States that share the same characteristics as the one at issue here; there is nothing "fundamentally" local about the steep grade/sharp curve combination. *See* Supplemental Declaration of Gary P. Wolf

in Support of Plaintiffs' Motion for Summary Judgment and Opposition to Counter–Motion at 2–3 (Jan. 31, 2000) (stating that the risk of derailment from improper train make up at "the California sites is not materially different from the risks encountered on curves in heavy grade terrain throughout the country"); Supplemental Declaration of Scott M. Dennis in Support of Plaintiffs' Motion for Summary Judgment and Opposition to Counter–Motion, amd. exs. C & D(identifying similar curves and grades throughout the nation); *see also Burlington N.,* 805 F.Supp. at 1528("Certainly, 'mountain grades' are not unique. They occur in many places of Montana and throughout the nation and are not peculiar to a particular locality."). The FRA is aware of the particular dangers on steep grade/sharp curve tracks and has adopted regulations covering the track strength on these areas. If the FRA standards are ineffective, they raise concerns for the numerous other localities around the country that have similar mountainous curves. The federal government could easily and adequately address such concerns.[12]

CPUC and the Unions contend, however, that we should look not only at the danger, but at the consequences of an accident as well. Once the risk of severe environmental damage is considered, they aver, the hazard becomes "essentially local." The Railroads and the United States dispute CPUC's argument and contend that environmental consequences can be

---

**12.** Our conclusion that the track standards at Site 9 raise an issue of national concern is reinforced by two congressional hearings on the Dunsmuir derailment in 1991, which culminated in the adoption of legislation that required DOT to conduct "[a]n assessment of regulations, rules, orders, or standards that address rail operations or procedures associated with carrying hazardous materials on rights-of-way having significant grades or high degrees of curvature." Rail Safety Enforcement and Review Act § 16(4), Pub.L. No. 102–365, 106 Stat. 972, 981 (1992); *see also* FRA, Forward through the 90s, *supra*, at 5–6 (noting that the FRA will "launch formal regulatory action" to prevent accidents such as the Dunsmuir derailment following the completion of studies to review train make up standards).

considered only if related to the probability of accidents.

■ We decline to determine whether environmental consequences can ever be considered in determining whether a condition is an "essentially local safety hazard" because in this case they clearly cannot be. As the United States argues in its brief, considering environmental consequences without looking to the hazard itself would allow a state to regulate the track strength or any other potential concern in tunnels and on bridges in every population center. This broad definition would effectively prohibit the FRA from ever being able to preempt state law, contrary to Congress's stated goal of uniformity in railroad safety to the extent practicable. To preserve Congress's express intention, we thus conclude that the external concerns must also be fundamentally local in nature.

The external risk in this case is the chance of severe environmental damage to the Sacramento River in the event of a derailment. While undoubtedly the damage is local in that the consequences of a derailment will affect only those dependent upon the river, the risk is not one that is fundamentally different from those of other locales. Indeed, the Railroads note that more than 10,000 miles of track are adjacent to waterways in North America: individuals dependent on their local waterway in every case would be devastated should an accident occur.

Because the steep grade/sharp curve combination can be adequately addressed by national standards, we conclude that Site 9 fails to meet the FRSA's definition of an "essentially local safety hazard." Ac-

cordingly, we need not address whether the remaining savings clause requirements are met.

### B

The Railroads also challenge CPUC's regulations governing its internal TTD rules. TTD is a general term covering almost any subject that affects a train's ability to stay on the tracks, including track geometry, speed limits, and train handling techniques. CPUC's regulations concentrate on one aspect of TTD: train configurations, also known as train make-up. Train configuration focuses on the order in which a train is assembled. "Specifically, [t]rain make-up ... involves placing cars in a train such that they balance the forces within the train. Here, relevant considerations include empty versus loaded cars, short versus long cars, and the effects of terrain and curvature." *Union Pac. R.R.*, 109 F.Supp.2d at 1194 (ellipsis in original) (internal quotation marks and citation omitted).

There are no federal train make-up rules; rather, the Railroads' internal rules govern their trains' configuration. For the purposes of this appeal, CPUC imposes two relevant TTD train configuration rules.[13] First, it requires Railroads to comply with their own internal rules and provides civil penalties for violations of those rules. 1997 CPUC Rulemaking, *supra*, at 169, *available at* 1997 WL 616304. Second, it requires Railroads to obtain approval before making any changes to its internal TTD rules. *Id.* at app. A.1.

The district court concluded that CPUC's regulation providing for civil pen-

---

**13.** CPUC also requires the Railroads to participate in developing and in implementing performance-based TTD rules. The Railroads did not challenge the district court's holding that the regulation was not preempted by the

FRSA. The Railroads did, however, challenge the district court's conclusion that the regulation violates the Commerce Clause. Discussion of this issue is found in Part IV.A, *infra*.

alties for violations of the Railroads' internal rules was not preempted by the FRSA, a decision which the Railroads appeal. The court also held, however, that requiring CPUC approval before Railroads could change their internal rules was preempted, a decision which CPUC appeals. These arguments are addressed in turn.

1

The district court held that the CPUC rule requiring Railroads to comply with their own internal rules was not "covered" by the FRSA because the FRA takes no "compliance-related" action relating to the information provided by the Railroads. Under CPUC's regulation, if a railroad failed to comply with its own TTD rule, it would be subject to civil penalties, *see* Cal. Pub. Util.Code § 7724.5; under the FRA's regulations, however, a violation of a railroad's TTD rule does not result in any penalty. The disagreement among the parties is whether 49 C.F.R. pt. 217 "covers" the same "subject matter" as CPUC's regulation.[14]

a

■ The Railroads contend that Part 217 deals with the risk of accidents attributable to noncompliance with railroad operating rules, including the Railroads' TTD rules, and the Railroads' efforts to ensure adherence to their own safety regulations. The United States and CPUC, on the other hand, contend that Part 217 has a "far different emphasis and scope" than the

CPUC rules. In the United States's view, Part 217 addresses all internal operating rules, not just the TTD rules, and does not mandate compliance with any of them; all the Railroads must do is conduct and document regular compliance testing and training.

Part 217 requires the Railroads (1) to file copies of their operating rules with the FRA, (2) to conduct tests and inspections to determine compliance with their operating rules, (3) to keep records of these tests and inspections and to report annually to the FRA, and (4) to train their employees periodically on their operating rules. The FRA does not regulate the content of the Railroads' operating rules relevant to this appeal.[15] Although the Railroads' operating rules do include TTD rules, no regulation specifically discusses the Railroads' TTD rules, and, in fact, no federal regulation requires the Railroads to include TTD rules within their operational rules.

Moreover, there is little doubt that the consequences of Part 217 and CPUC's regulation are different. Instead of fining a railroad for non-compliance with an internal operating rule, the FRA files a deficiency, which has no definitive adverse consequences. *See* Fed. R.R. Admin., U.S. Dep't of Transp., Operating Practices Compliance Manual 4–5 (May 1998) (hereinafter "FRA, Operating Practices Compliance Manual") ("An inspector cannot recommend a violation for civil penalties against a railroad nor a railroad employee

---

14. CPUC argues that we have held that Part 217 cannot preempt state law. This is not entirely true. We have noted that "[b]ecause the FRA neither approves nor adopts the railroad's rules in any manner, the rules do not have the force of law and therefore cannot preempt [an Oregon statute requiring a locomotive to be equipped with a certain audio device]." *S. Pac. Transp. Co. v. Pub. Util. Comm'n,* 9 F.3d 807, 812 n. 5 (9th Cir.1993). In context, we merely held that the Railroads'

rules themselves had no preemptive effect and thus the state could institute operating rules above those required by the Railroads. Here, the state is seeking to enforce compliance with the Railroads' rules themselves, a subject that the FRA has arguably addressed.

15. The FRA does require minimum operating rule standards relating to alcohol and drug use. *See* 49 C.F.R. pts. 218, 219.

for a violation of a railroad operating rule. It is expected, however, that the inspector would file a deficiency ... for such an observance."). The FRA Operating Manual only allows sanctions if a railroad "fails to promote and require compliance with its operating rules in the spirit intended by the regulation." *Id.* at 4–9.

The FRA required training on the Railroads' operating rules in part, however, because it was aware that safety is compromised when Railroads fail to comply with their own rules. The FRA noted,

> Many accidents are attributable to a lack of compliance with railroad operating rules or a misinterpretation of their intended application. If a company's employees have a better understanding of the existing rules, even with their shortcomings, the chances for noncompliance or misinterpretation should be reduced. Therefore, each railroad would be required to conduct an approved program of instruction. . . .

*Id.; see also* FRA, Operating Practices Compliance Manual, *supra,* at 4–5("Clearly when compliance effectiveness erodes, the accident/incident risk and rate increase. Given this circumstance, examination has found that, in these cases, the intent and requirements of the regulation

have been compromised.").[16] In promulgating Part 217, the FRA thus noted that it had two purposes: (1) to collect information necessary for the "formulation of uniform operating rules," and (2) to inform the Railroads' employees of the "meaning and application of the company's operating rules" so as to reduce non-compliance with the Railroads' operating rules. 38 Fed. Reg. 12,617 (1973).

Here, the parties' arguments concern whether such secondary purpose is sufficient to cover the regulations at issue: we are asked to decide whether mandating training to increase compliance with the Railroads' internal operating rules "covers" a different subject matter from CPUC's regulation, which mandates compliance with the Railroads' internal TTD rules through civil penalties.

### b

■ The standard for "covering" under the FRSA is "not ... easy."[17] *S. Pac. Transp. Co. v. Pub. Util. Comm'n,* 9 F.3d 807, 812 (9th Cir.1993). As the Supreme Court has explained,

> [t]o prevail on the claim that the regulations have pre-emptive effect, petitioner must establish more than that they

---

**16.** The FRA has also explicitly adopted the position that Part 217 enforces compliance with the Railroads' operating rules in other contexts. For example, when addressing human factors in railroad safety, the FRA stated that Part 217 requires the Railroads to "conduct programs of instruction, operational tests and inspections to enforce compliance with their own safety rules." 43 Fed.Reg. 10,588 (1978); *see also* Safety Directive 97–1, 62 Fed.Reg. 35,330 (1997) (stating that one of the objectives of Part 217 is to "[i]mprove employee compliance with railroad operating rules.").

**17.** The Railroads argue that *United States v. Locke,* 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000) instructs us that where there is a "history of significant federal pres-

ence" there is no "presumption against preemption." The Railroads contend that railroad safety is one such area, and therefore we should not be reluctant to find preemption. Their argument is not convincing. *See CSX Transp., Inc. v. City of Plymouth,* 283 F.3d 812, 817 (6th Cir.2002). First, the Court's "presumption against preemption" was a product of statutory interpretation. *Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732. Second, FRSA was only enacted in 1970. Prior to that time railroad safety was largely regulated by the states. This is much different from the maritime law at issue in *Locke,* which has been almost exclusively federally regulated since the Founding. *Locke,* 529 U.S. at 99, 120 S.Ct. 1135.

"touch upon" or "relate to" that subject matter, for "covering" is a more restrictive term which indicates that *pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law.* The term "covering" is in turn employed within a provision that displays considerable solicitude for state law in that its express pre-emption clause is both prefaced and succeeded by express saving clauses.

*CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664–65, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (citations omitted) (emphasis added). In accordance with *Easterwood,* Part 217 must do more than "relate to" to CPUC's regulation, it must "substantially subsume" the same subject matter. To avoid the "unintended encroachment on the authority of the states," we must proceed cautiously. *Mich. S. R.R. v. City of Kendallville,* 251 F.3d 1152, 1153 (7th Cir. 2001) (citing *Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732).

Both parties, the United States, and the Unions rely on *Easterwood* in arguing their case for and against preemption. In *Easterwood,* the Court considered the preemptive effect of federal regulations on state negligence law. There, the widow of a man killed at a railroad crossing had brought a wrongful death diversity action against the railroad for negligence under Georgia law in failing to maintain adequate warning devices at the crossing and for operating the train at an excessive speed.

The Court first addressed whether state law regarding adequate warning devices was preempted by federal regulations. The Court noted that 23 C.F.R. pt. 924, which requires the state to take certain steps before receiving federal funding for train crossings, and the FHWA's Manual on Uniform Traffic Control Devices for Streets and Highways, which sets forth standards for traffic control devices, "but not a legal requirement for installation," did not cover the subject matter of state negligence law. 507 U.S. at 668–69, 113 S.Ct. 1732. Rather than preempting state law, these regulations establish the "general terms of the bargain between the Federal and State Governments" and allocate responsibility between the different actors. *Id.* at 667, 113 S.Ct. 1732.

The Court stated, however, that 23 C.F.R. § 646.214(b)(3) and (4), which *require* the installation of certain warning devices at a crossing or FHWA approval if federal funds participate in the installation at a crossing, preempt all state negligence claims regarding the adequacy of the safety requirements at the crossing. *Id.* at 670, 113 S.Ct. 1732; *see also Norfolk S. Ry. v. Shanklin,* 529 U.S. 344, 352, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000) (holding that any installation performed pursuant to these sections preempts state law as to the adequacy of the safety requirements). In that particular case, the Court held that while the federal government installed some new circuitry at the crossing at issue and gates at all the adjacent crossings, the final plans for the crossing were shelved when the city refused to approve construction for a traffic island needed for full installation. *Easterwood,* 507 U.S. at 671–72, 113 S.Ct. 1732. According to the Court, the preliminary steps the federal government participated in were insufficient to "cover" the subject matter of safety requirements. *Id.* at 672, 113 S.Ct. 1732.

We consider the Court's instruction on this point helpful. Like Part 924, Part 217 does not require the Railroads to comply with any regulations, but rather sets the stage for further rulemaking. The federal government determined that, as an initial matter, it would test compliance with the railroads' operating rules. Although it

took initial steps in determining whether a railroad should be penalized for a violation of its own rule, it never penalized negligent compliance.

The Railroads, however, point to the Court's discussion of Easterwood's second claim: whether state negligence law as applied to unsafe operating speeds was preempted. In addressing this claim, the Court concluded that 49 C.F.R. § 213.9(a), which sets the maximum allowable operating speeds for all trains, "covered" the claim of negligence based on unsafe operating speeds. *Id.* at 674–75, 113 S.Ct. 1732. The Court noted that although the FRA's speed regulations were primarily concerned with derailment risks, not safe grade crossings, they were enacted only after track condition hazards were taken into account, and thus preempted a state negligence claim for traveling at an unsafe speed. *Id.* The Railroads argue that the secondary purpose of Part 217 similarly covers CPUC's regulation.

Here, although the FRA may have had the same purpose in mind as CPUC, the FRA failed to "cover" the actual subject matter: the FRA was aware that dangers existed, but it chose to test compliance rates rather than seek to mandate compliance with any particular rule. This is insufficient to preempt CPUC's regulation. *Id.* at 675, 113 S.Ct. 1732("Section [20106] does not ... call for an inquiry into the Secretary's purposes, but instead directs the courts to determine whether regulations have been adopted that in fact cover the subject matter of train speed."); *Burlington N. R.R. v. Montana,* 880 F.2d 1104, 1106 (9th Cir.1989) (holding that the state cannot "regulate train safety problems that the FRA has already addressed").

Furthermore, the FRA's determination that its regulations do not substantially subsume the subject matter of CPUC's regulation deserves some deference in this instance. As we have noted, "[a]n agency's interpretation of the preemptive effect of its regulations is entitled to deference where Congress has delegated authority to the agency, the agency's interpretation is not contrary to a statute, and agency expertise is important to determining preemption." *Indus. Truck Ass'n v. Henry,* 125 F.3d 1305, 1311 (9th Cir.1997); *accord United States v. Mead Corp.,* 533 U.S. 218, 234–35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). The United States argues that the Railroads' interpretation of Part 217 would handcuff the agency. The agency would be forced either to adopt regulations before collecting all of the relevant data or to forgo regulating at all. It would no longer be able to take a piecemeal approach to regulating, where, as here, it contends that it chose to test compliance rates rather than mandate compliance. Certainly this is a situation where at least the FRA's determination is entitled to deference to the extent that its interpretation has the "power to persuade." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *accord Mead,* 533 U.S. at 235, 121 S.Ct. 2164.

Even if Part 217 could arguably be interpreted to cover the same subject matter, the agency's determination is persuasive. The agency has narrowly interpreted the preemptive scope of the FRSA, and has concluded that because Part 217 explicitly covers training programs, and does not coerce the Railroads to comply, Part 217 does not cover the same subject matter as CPUC's regulation. This interpretation is consistent with the Supreme Court's requirement that the federal regulation do more than merely relate to the subject matter at hand; rather, it must "substantially subsume" the matter.

The FRA's interpretation does not "too finely slice[ ] the subject matter of the . . . regulations." *Doyle*, 186 F.3d at 801. Under the distinction the FRA creates, it retains its ability to demand uniformity in railroad safety and may expressly preempt the state regulation by taking non-compliance action against the Railroads in any manner it chooses. Until the FRA chooses to do so, however, we conclude that Part 217 does not cover the same subject matter as CPUC's rule.

2

■ CPUC appeals the district court's determination that the Railroads' internal TTD rules were "covered" by FRA regulations.[18] The district court held that CPUC's regulation was preempted because "it would be totally inconsistent [for the FRA] to defer to the railroads regarding the content of their rules, but then require that the rules, or modifications thereto, be subject to 'approval' by the different states." *Union Pac. R.R.*, 109 F.Supp.2d at 1196. The Railroads agree with the court and contend that Part 217 already addresses the "safety concern" that CPUC wishes to regulate: whether Railroads should be able to change their own TTD operating rules without prior approval.

To decide this issue, we must once again look to whether 49 C.F.R. pt. 217 covers the state regulations at issue. As noted above, 49 C.F.R. §§ 217.7–.11 requires the Railroads (1) to file copies of their operating rules with the FRA, (2) to conduct tests and inspections to determine compliance with their operating rules, (3) to keep records of these tests and inspections and to report annually to the FRA, and (4) to train their employees periodically on their operating rules. Part 217 does not require federal approval of any changes to the rules.

The question is whether the FRA, by not requiring federal approval of the Railroads' operating rules, "substantially subsumed" the subject matter. It is clear that Part 217 seeks to gather information regarding the Railroads' rules and requires training to ensure compliance with them.[19] It is much less pellucid, however, that it "covers" the subject of government approval.

The Railroads cite to the FRA's explicit rejection of prior state approval for training programs because such a requirement would "seriously impair rail management's flexibility to amend [its] programs in light of changing operating conditions." 39 Fed.Reg. 41,176. But there is no evidence that the FRA applied the same reasoning to the Railroads' internal operating rules. There was simply no need for the FRA to have considered whether approval of operating rules was appropriate. In fact, the FRA explicitly noted that it was not addressing the content of the Railroads' rules, but rather reserved that issue for future rulemaking. *See* 38 Fed.Reg. 12,-617 ("The information to be gained through the implementation of these requirements is considered necessary to the formulation of uniform operating rules."); *see also* FRA, Forward Through the 90s, *supra*, at 84(noting that the FRA did not expect to begin formally regulating TTD rules until at least 1996).

---

18. The district court also concluded that the regulation was not valid under the second savings clause because it was not necessary to reduce an essentially local safety hazard. The parties do not appeal this determination.

19. No one contends that the substance of the Railroads' rules cover the subject matter. Clearly, the FRA, not the Railroads, must "cover" CPUC's regulations. *See S. Pac.*, 9 F.3d at 812 n. 5.

Because the FRA merely deferred making a rule, rather than determining that no regulation was necessary, the state can legitimately seek to fill this gap. *See Tyrrell v. Norfolk S. Ry.*, 248 F.3d 517, 525 (6th Cir.2001) ("[N]o evidence in this case demonstrates that the FRA considered track clearance requirements and explicitly decided that no regulation in the area was necessary."); *Doyle*, 186 F.3d at 802; *Mo. Pac. R.R. v. R.R. Comm'n*, 833 F.2d 570, 575–76 (5th Cir.1987). Without evidence of a decision that no FRA regulation was needed in this area, we must conclude that CPUC's regulation is not preempted. We must therefore reverse the district court's determination and remand for proceedings on commerce clause grounds not inconsistent with this opinion.

## C

■ CPUC also appeals the district court's determination that its training regulations are preempted by federal law. CPUC's training regulations require the Railroads to administer train configuration tests to all "employees who perform service" at the thirteen sites at issue to ensure the Railroads' own operating rules are correctly applied. 1997 CPUC Rulemaking, *supra*, at app. A.2, *available at* 1997 WL 616304. CPUC does not dispute that the federal regulations require the Railroads to conduct some training, but instead insists that the current training is not adequate. It contends that railroad employees needed better training, "especially at rail segments which have historically high accident rates or particularly demanding operational characteristics." *Id.* at 81. Because the federal regulations do not regulate the content of the Railroads' training program and randomly test employees, CPUC argues that its regulation has not been covered by the FRA.

This argument is unpersuasive. It is clear that the federal training regulations do "substantially subsume" the subject of employee training. *See Easterwood*, 507 U.S. at 664, 113 S.Ct. 1732. To "ensure" that railroad employees understand the Railroads operating rules, section 217.1 states, "each railroad ... shall periodically instruct each [ ] employee on the meaning and application of the railroad's operating rules in accordance with a written program...." Section 240.123 requires specific training regarding continuing education for certified locomotive engineers. While CPUC's regulations are more specific and stringent than the federal government's, they both mandate training on the Railroads' own internal operating rules for the same safety concerns. *Cf. Burlington N. R.R.*, 880 F.2d at 1106; *Doyle*, 186 F.3d at 801–02. We agree with the district court that CPUC's regulation is preempted by the FRSA.

## III

To the extent that the FRSA did not preempt CPUC's regulations mandating compliance with the Railroads' internal operating rules, the Railroads contend that the regulation is preempted by the LBIA and the SAA because CPUC asserts jurisdiction over the Railroads' selection of locomotives and couplers. Because we concluded that the FRSA did not preempt CPUC's imposition of civil penalties against the Railroads for failing to follow their own internal operating rules, we must address the Railroads' claims.

## A

■ The Railroads' TTD rules restrict the size and number of locomotives that can haul freight over certain routes. The Railroads argue that CPUC, by adopting the Railroads' internal rules, has asserted jurisdiction to enforce locomotive deci-

sions: if the railroad chooses a locomotive that does not comply with its own rules, it is subject to fines.

The LBIA prohibits Railroads from using a locomotive unless "the locomotive or tender and its parts and appurtenances ... are in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701. The Supreme Court has held that this statute "occup[ies] the field" regarding "the design, the construction and the material of every part of the locomotive and tender and of all appurtenances." *Napier v. Atl. Coast Line R.R.*, 272 U.S. 605, 613, 611, 47 S.Ct. 207, 71 L.Ed. 432 (1926); *see also Marshall v. Burlington N., Inc.*, 720 F.2d 1149, 1152 (9th Cir.1983). We have interpreted this mandate as occupying the field of locomotive equipment, but not locomotive use. As we noted in *Southern Pacific*,

> The Supreme Court's decision in *Napier* describes the LBIA as regulating the 'design, the construction and the material' of every part of the locomotive, but does not mention the *use* of locomotive parts. Because the Oregon law neither limits nor expands the type of equipment with which locomotives are required to be equipped, it neither interferes with the goals of the LBIA nor substantially interferes with its implementation.

*S. Pac.*, 9 F.3d at 811 (emphasis in original).

Here, like the regulation at issue in *Southern Pacific*, CPUC's regulation neither "limit[s] nor expand[s] the type of equipment"; rather, it merely requires that the Railroads follow its own regulations regarding the number or order of locomotives, *i.e.*, regulates the use of locomotives. Accordingly, CPUC's regulation is not preempted by the LBIA.

## B

■ The Railroads' internal operating rules require employees to limit the weight of trailing tonnage behind different kinds of couplers, as recommended by the manufacturers. The rules restrict trains to trailing a maximum weight of 5400 tons behind a "Standard" coupler and to a greater maximum trailing tonnage, 8500, behind "High Strength" couplers. If the Railroads entrain too much tonnage behind either coupler, at designated sites, they may be subjected to fines under CPUC's regulations.

The SAA requires rail cars to be equipped with enumerated safety features, such as certain types of couplers, brakes, running boards, and handholds. 49 U.S.C. § 20302. Relevant to this appeal, the SAA requires that railcars be equipped with automatic couplers that do not need to be disengaged by workers positioned between cars. *Id.* § 20302(a)(1)(A). The SAA occupies the entire field with respect to the requirements for those safety devices covered under the Act. *Gilvary v. Cuyahoga Valley Ry.*, 292 U.S. 57, 60–61, 54 S.Ct. 573, 78 L.Ed. 1123 (1934) ("So far as the safety equipment of such vehicles is concerned, these acts operate to exclude state regulation whether consistent, complementary, additional, or otherwise."); *Jordan v. S. Ry.*, 970 F.2d 1350, 1354 (4th Cir.1992); *see also S. Ry. v. R.R. Comm'n*, 236 U.S. 439, 447, 35 S.Ct. 304, 59 L.Ed. 661 (1915). Thus, both parties agree that if CPUC's TTD rules regulate the use of couplers, then the regulation is preempted.

The Railroads and the United States argue that the CPUC regulation impermissibly regulates the use of couplers. CPUC counters that its rule solely regulates railcar placement because couplers are part of the car and cannot be interchanged. The only discretion for the employee is car placement, *i.e.*, train configuration. A car

with a standard coupler may have to be configured in the rear of the train so that there is less trailing tonnage behind it, but in its view, the regulation of the configuration does not regulate the use of couplers.

CPUC's argument is not persuasive. While the car may have to be moved in its entirety to the rear of the train, it is the coupler that requires the re-configuration. Under CPUC's regulation, if the trailing tonnage is greater than 5400 tons, Standard couplers cannot be used. This is an additional safety regulation on the use of couplers and is therefore preempted by the SAA. *See Gilvary,* 292 U.S. at 60–61, 54 S.Ct. 573; *Jordan,* 970 F.2d at 1354. We must remand to the district court to determine whether CPUC may enforce the Railroads' remaining TTD rules in the absence of the coupler restrictions.[20]

## IV

■■■ The Railroads further contend that some of CPUC's regulations, which are not preempted by federal law, run afoul of the Commerce Clause. U.S. Const., art. 1, § 8, cl. 3. Although, on its face, the Commerce Clause only provides congressional authority to regulate interstate commerce, the Supreme Court has interpreted the clause to prohibit the states from unduly interfering with interstate commerce absent congressional consent. *See, e.g., Raymond Motor Transp.,*

*Inc. v. Rice,* 434 U.S. 429, 441, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978); *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *see also S. Pac. Co.,* 325 U.S. at 766–67, 65 S.Ct. 1515.

The Railroads argue that the indirect effects of CPUC's regulations will burden interstate commerce. The CPUC regulations are afforded a presumption of constitutionality, *Burlington N.,* 763 F.2d at 1114, and the Railroads must meet this rather stringent test: "When [ ] a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); *accord Pike,* 397 U.S. at 142, 90 S.Ct. 844. To prevail, the Railroads must demonstrate that CPUC's regulations " 'impede substantially the free flow of commerce from state to state' or that train configuration, 'because of the need of national uniformity' can only be regulated by the national government." *Burlington N.R. Co. v. Dep't of Pub. Serv. Reg.,* 763 F.2d 1106, 1114(9th Cir.1985); *see also Pike,* 397 U.S. at 142, 90 S.Ct. 844.

## A

■■■ The district court concluded that CPUC's rule requiring the Railroads to

---

**20.** We are essentially in agreement with the district court on this issue. The district court held, "To the extent . . . that the CPUC would interpret its rules to require the railroads to use high strength couplers when exceeding certain maximum trailing tonnage, such couplers are among the safety appliances covered by the SAA, and thus such a requirement would be preempted by that statute." *Union Pac. R.R.,* 109 F.Supp.2d at 1208 n. 28. The court concluded, however, that CPUC's regulations did not necessarily regulate the use of couplers and thus any challenge is premature. *Id.* at 1213.

We disagree with the district court on this last point. CPUC has reserved the right to levy civil penalties against the Railroads for failing to comply with their internal TTD rules, part of which regulate the use of couplers. *See* 1997 CPUC Rulemaking, *supra,* at 169, *available at* 1997 WL 616304. Because any fine levied against the Railroads for failing to comply with their internal rules regarding couplers must fail, the Railroads' argument is reviewable. *See Freedom to Travel Campaign v. Newcomb,* 82 F.3d 1431, 1434–36 (9th Cir. 1996).

cooperate in the development and the implementation of performance-based train make-up standards was not preempted by the FRSA, the LBIA, or the SAA, but would constitute an undue burden on interstate commerce. Initially, the district court held that such rule violated the Commerce Clause for seven of the 13 designated sites, but later amended its judgment to hold that the rule, in its entirety, impermissibly burdened interstate commerce at all 13 sites.

Performance-based standards are different than make-up rules. Performance-based standards provide an underlying general mathematical formula for safety, which can be applied to any given train location to determine whether that configuration was safe. Train make-up rules, on the other hand, are a listing of acceptable individual technical provisions for the train at each location. According to CPUC, a performance-based standard would allow the Railroads to apply one formula that ensures a number of different configurations are safe at all the locations.

Because the Railroads already have train make-up rules, the CPUC contends that the development of performance-based standards, which all agree are easier to apply, would not substantially burden interstate commerce. This regulation, however, does not merely adopt the Railroads' own rules. Instead, it requires the Railroads to develop and implement new standards, subject to CPUC approval.[21]

While CPUC does not regulate conduct outside of California, the extra-territorial effect of its regulation is undisputed. Both parties concede that trains are not reconfigured during transit, so, for example, a train leaving Nebraska and traveling to Los Angeles would be initially configured so as to meet the most stringent standards on its trip. Thus, any rule regarding the make-up of a train will have extra-territorial effects in a number of different states. While the extra-territorial effects of only one state regulatory regime are relatively minor, if California can require the Railroads to develop and to implement performance-based standards, so can every other state, and there is no guarantee that the standards will be similar. The effect of such a patch-work regulatory scheme would be immense. *See Mich. S. R.R. Co.*, 251 F.3d at 1155. As the district court found, because there is no universal standard, "subjecting plaintiffs to the extensive amount of inconsistent state regulation California's rule would necessarily permit, would undermine the need for substantial uniformity in this area and interfere with interstate commerce." *Union Pac. R.R.*, 109 F.Supp.2d at 1217.

Importantly, CPUC does not contend that performance-based standards are safer than the Railroads' train make-up rules; it contends only that the stan-

---

**21.** In relevant part, the regulation states,
1. Railroads shall cooperate and work with Staff and any other interested parties, to develop and implement, subject to Commission approval, performance-based standards for train configurations based on current track-train dynamics principles, and administrative procedures for modifying the performance-based standards and the rules derived from those standards.

. . . .

3. If no consensus is reached between Staff and the Railroads regarding the implementation of administrative procedures and performance-based standards for train configurations within 90 days from the effective date of this decision, Staff shall nevertheless submit for the Commission's consideration proposed administrative procedures and performance-based standards for track-train dynamics based on up-to-date track-train dynamics principles.
1997 CPUC Rulemaking, *supra,* at 168, *available at* 1997 WL 616304.

dards will be easier to apply and to comply with. Indeed, CPUC argues that it will merely mirror the Railroads' rules. The interest in easing the administrative burden of applying the Railroads' more technical rules pales in comparison to the burden of requiring potentially conflicting state standards. Under Supreme Court precedent, such extra-territorial burden is constitutionally infirm. *See Raymond Motor Transp.*, 434 U.S. at 445–46, 98 S.Ct. 787; *S. Pac. Co.*, 325 U.S. at 775, 65 S.Ct. 1515; *see also Healy v. Beer Inst.*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). We conclude that the Railroads have demonstrated that CPUC's rule, requiring the development and implementation of performance-based rules, is "clearly excessive in relation to the putative local benefits," *see Pike*, 397 U.S. at 142, 90 S.Ct. 844, and we must affirm the district court's judgment on this issue.[22]

## B

Having failed to convince us that the FRSA, the LBIA, and the SAA do not preempt CPUC's imposition of civil fines for violating their own train make-up rules in full, the Railroads argue that CPUC's regulation impermissibly burdens interstate commerce:[23] if California could fine them for failing to comply with their own rules, then so could every state. The Railroads contend that this regulation places an impermissible burden upon them because the state has only a minimal interest; there is no showing that safety would

be increased by mandating compliance with its own TTD rules. Moreover, trains rarely derail because of train configuration: according to the Railroads, California has had only 12 derailments between 1987 and 1997 due to improper train configuration.

It is undisputed, however, that if the trains are configured according to the Railroads' present TTD rules that the risk of derailment is decreased. Certainly the state has a legitimate and very strong interest in preventing train derailments so as to protect the safety and welfare of its citizens and the environment. By ensuring compliance with the Railroads' rules, the state's legitimate interest in decreasing train derailments, even minimally, is furthered.

The corresponding burden on the Railroads is relatively low. Presumably, the Railroads follow their own rules during all transports, so the enforcement of these rules should add little, if any, extra burden. Importantly, there is also no danger to the goal of national uniformity: CPUC adopts the Railroads' own internal rules and the Railroads themselves are the masters of such rules. As the district court noted, any confusion regarding the application of rules between neighboring states can be clarified by the Railroads. In fact, the Railroads could eliminate their TTD rules entirely if they so choose. Thus, the burden on the Railroads is only as extensive as the Railroads themselves make it.

---

**22.** CPUC argues this claim is not ripe because no standards are issued. This argument fails because it is clear that any standard required would impermissibly burden interstate commerce. *See supra,* note 20.

**23.** CPUC and the Unions contend that we should not conduct an Commerce Clause analysis if we determine that the regulation is not covered by federal law because the FRSA has displaced the Commerce Clause in this

field. While Congress may displace the Commerce Clause to allow unfettered state regulation, it must be "unmistakably clear" in its intention to do so. *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 91, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). Here, Congress was not unmistakably clear and in fact stated that national uniformity was one of FRSA's stated goals. 49 U.S.C. § 20106. Their argument is thus without merit.

Because the burden on the Railroads is minor and the regulation does not interfere with the goal of national uniformity, CPUC's regulation does not impermissibly burden interstate commerce. *See Burlington N.*, 763 F.2d at 1114.

## V

For the foregoing reasons, the district court's judgment is AFFIRMED IN PART, REVERSED IN PART, and RE-MANDED.[24]

---

24. Each party shall bear its own costs on appeal. *See* Fed. R.App. P. 39(a)(4).