# IN THE SUPREME COURT OF IOWA

No. 18–2039

Submitted December 15, 2020—Filed March 5, 2021

**RICHARD J. WERMERSKIRCHEN** and
**CAROL M. WERMERSKIRCHEN,**

  Appellants,

vs.

**CANADIAN NATIONAL RAILROAD,**
a/k/a **CN,** a/k/a **CN RAILWAY, CHICAGO,**
**CENTRAL & PACIFIC RAILROAD COMPANY,**
a/k/a **CCP, ILLINOIS CENTRAL RAILROAD**
**COMPANY, TIM DORSEY,** and **JOSH VOKEM,**

  Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, Linda M. Fangman, Judge.

A railroad seeks further review of a court of appeals decision reversing a grant of partial summary judgment in a case arising out of a collision. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which Waterman, McDonald, Oxley, and McDermott, JJ., joined. Appel, J., filed an opinion concurring in part and dissenting in part. Christensen, C.J., took no part in the consideration or decision of the case.

Jordan M. Talsma (argued), and John R. Walker, Jr., of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C., Waterloo, for appellants.

R. Todd Gaffney (argued) and Kellen B. Bubach of Finley Law Firm, P.C., Des Moines, for appellees.

**MANSFIELD, Justice.**

This case involves a collision between a freight train and a road grader on a foggy Iowa winter morning. It is jarring to watch the locomotive's video of the accident. Suddenly, about six seconds before the crash, the road grader comes into sight approaching the tracks. The grader keeps moving forward continuously without stopping. The grader then begins to cross the tracks. About three seconds later, the train strikes the front of the grader and continues for another half mile or so before coming to stop.

As a result of the collision, the driver of the grader was seriously injured. He sued the railroad and the train crew alleging excessive speed, failure to keep a proper lookout, failure to brake, and failure to sound the horn properly.

The district court granted summary judgment to the defendants on all but the horn claims. It determined that federal law preempted the excessive speed claims since the train was in compliance with the applicable federal speed regulation. It also reasoned that the lookout and braking claims were either preempted as related to the excessive speed claims, or barred by lack of causation. In the court's view, even immediate braking at the earliest time when the grader became visible would not have prevented the serious collision that resulted. Two months later, a jury returned verdicts for the defendants on the horn claims. The plaintiffs appealed.

Following transfer, the court of appeals affirmed the defense verdict on the horn claims but reversed the summary judgment for the defendants on the other claims and directed a second trial. We granted further review and now reinstate the district court's grant of summary judgment.

## I. Facts and Procedural History.

On the morning of January 28, 2013, in rural Black Hawk County, freezing rain was falling, and the fog was heavy. A 113-car freight train operated by Chicago, Central & Pacific Railroad Company (CCP) was traveling westbound on the tracks at approximately forty-seven miles per hour.[1] Under federal regulations, the speed limit on that stretch of track was sixty miles per hour.

Meanwhile, Richard Wermerskirchen, a county employee, was operating a forty-foot-long John Deere 772G road grader to "scarify," or rough up, the gravel surfaces to improve traction for drivers. At around 9:30 a.m., Wermerskirchen's grader was heading northbound on Nesbit Road at about fifteen miles per hour as it approached the railroad crossing. The crossing was visibly marked with crossbucks and a yield sign, and there was also a yellow advance warning sign 700 feet from the intersection. Wermerskirchen was familiar with the intersection. He had crossed it approximately 100 times before, including two prior times that morning.

Visibility was poor, but Wermerskirchen claims that he listened for a horn and heard none. From prior experience, Wermerskirchen could normally hear the horn from approximately one mile away.

Wermerskirchen elevated the plow and scarifier and proceeded across the tracks at approximately eight to twelve miles per hour. The video on the lead locomotive shows the grader pulling onto the tracks directly in front of the train. On the video, the grader becomes visible approximately six seconds before the collision and enters the crossing

---

[1]CCP is part of the Illinois Central Railroad, which in turn is a subsidiary of Canadian National Railway. The plaintiffs sued all of these entities as well as Timothy Dorsey and Joshua Yokem, who were respectively the engineer and the conductor on duty that day. Hereafter we will refer to all the defendants collectively as "CCP."

approximately three seconds before the collision. Engineer Timothy Dorsey and conductor Joshua Yokem, anticipating an immediate collision, dove to the ground without activating the emergency brake. The locomotive struck the grader and continued another half mile before coming to a stop.[2]

The crash struck the front part of the grader and ejected Wermerskirchen out the grader's back window. He landed on the grass with a piece of metal lying across his legs. Dorsey and Yokem came running back, but Yokem was unable to lift the metal bar. Eventually emergency medical technicians were able to free Wermerskirchen. He suffered serious injuries, including a broken pelvis, a broken left ankle, five broken ribs, and a cracked sternum.

The event recorder on the lead locomotive showed that the bell was operating continuously up until the collision and that the horn had been sounded repeatedly. This was consistent with the recollection of both Dorsey and Yokem.[3]

On December 18, 2014, Wermerskirchen and his spouse sued CCP in the Black Hawk County District Court.[4] As amended, their petition alleged negligence in the following respects: (1) operating the train at an excessive speed under the circumstances, (2) failing to maintain a proper lookout, (3) failing to apply the brakes in a proper manner, and (4) failing to sound an audible warning sufficiently in advance of the crossing.

On July 20, 2017, CCP moved for summary judgment on all claims. They maintained that the train complied with the federal speed limit and

---

[2]The brake was applied approximately ten seconds after the collision.

[3]They had also turned on the headlight and ditch lights.

[4]The claim of Wermerskirchen's spouse was for loss of consortium and was derivative of his claim. For the sake of simplicity, we shall refer to the plaintiffs collectively as "Wermerskirchen."

that federal law preempted Wemerskirchen's excessive speed claims. They also urged that the lookout and braking claims were related to speed and thus preempted or alternatively failed as a matter of law on causation. CCP argued that even Wemerskirchen's expert conceded that keeping a proper lookout and initiating braking immediately on seeing the grader would not have prevented the collision. Regarding the horn claims, CCP maintained that there was no issue of fact that its crew sounded the horn in accordance with federal regulations and that the horn was working properly.

Wermerskirchen resisted CCP's motion. Among other things, he argued that federal law did not have preemptive force because claims involving essentially local or individual safety hazards, such as the weather conditions on January 28, 2013, were not preempted. He also argued there were issues of fact as to whether the horn was operating properly and in compliance with federal regulations.

On September 15, 2018, the district court entered a ruling granting CCP's motion in part and denying it in part. The court found that weather conditions did not provide a basis for avoiding federal preemption and therefore the excessive speed claims were expressly preempted. The court also found that the lookout and braking claims were barred. To the extent Wermerskirchen was arguing that the train's speed left the crew with insufficient time to react before striking the grader, such a claim directly related to the speed of the train and was therefore preempted. To the extent Wermerskirchen was arguing that the crew could have and should have braked at the first moment when the grader would have been visible, that claim flunked a causation test. On that point, the undisputed evidence showed that any action would have been too late by then to prevent a violent collision. The district court denied summary judgment

on the horn claims on the ground there were fact questions as to how and when the horn was sounded.

The horn-related claims proceeded to a jury trial beginning October 30. On November 7, the jury returned a verdict for CCP.

Wermerskirchen filed a notice to appeal on November 27. He argued that the district court had erred in granting summary judgment on the excessive speed, lookout, and braking claims. He also challenged certain evidentiary rulings and the giving of certain jury instructions by the district court. We transferred his appeal to the court of appeals.

On February 19, 2020, the court of appeals issued an opinion affirming in part and reversing in part the judgment entered after summary judgment and trial proceedings. That court concluded that partial summary judgment should not have been granted. In the court of appeals' view, preemption did not apply and there were issues of fact on causation. However, the court of appeals affirmed the jury verdict on the horn claims, determining that there had been no error in the evidentiary rulings or in the giving of jury instructions.

CCP filed an application for further review, which we granted.

## II. Standard of Review.

"On further review, we have the discretion to review all or some of the issues raised on appeal or in the application for further review." *State v. Roby*, ___ N.W.2d ___, ___ (Iowa 2020) (quoting *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012)). We choose to review only the ruling granting summary judgment on the excessive speed, lookout, and braking claims. We let the court of appeals decision stand as our final decision on the trial of the horn-related issues.

We review the grant of summary judgment for correction of errors at law. *Susie v. Fam. Health Care of Siouxland, P.L.C.*, 942 N.W.2d 333, 336 (Iowa 2020). As we said in *Susie v. Family Health Care of Siouxland, P.L.C.*,

> The burden is on the moving party to demonstrate the nonexistence of a material fact question. However, the nonmoving party may not rely on mere allegations in the pleadings but must set forth specific facts showing a genuine issue for trial. If the nonmoving party cannot generate a prima facie case in the summary judgment record, the moving party is entitled to judgment as a matter of law.

942 N.W.2d at 336–37 (citations omitted).[5]

### III. Legal Analysis.

**A. The FRSA Preempts the Excessive Speed Claims.** The Federal Railroad Safety Act (FRSA) governs railroad safety and has an express preemption clause. Title 49 U.S.C. § 20106, part of FRSA, provides,

> **(a) National uniformity of regulation.—(1)** Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.
>
> **(2)** A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order--
>
> **(A)** is necessary to eliminate or reduce an essentially local safety or security hazard;
>
> **(B)** is not incompatible with a law, regulation, or order of the United States Government; and

---

[5]The facts will be viewed in the light most favorable to the nonmoving party. *Fam. Health Care*, 942 N.W.2d at 337. Therefore, the proof must be presented in a manner that leaves no room for the fact finder to speculate about who the negligent culprit is. *Id.* Thus, affirming that cases rooted in speculation do not constitute a genuine issue of fact. *Id.*

**(C)** does not unreasonably burden interstate commerce.

**(b) Clarification regarding State law causes of action.—(1)** Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party--

**(A)** has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

**(B)** has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

**(C)** has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

Thus, the FRSA establishes a policy of nationally uniform railroad safety regulation and prohibits states from having different safety laws when a federal regulation or order covers the same subject matter. 49 U.S.C. § 20106(a)(1). However, it allows states to have more stringent legal requirements when "necessary to eliminate or reduce an essentially local safety or security hazard," so long as those requirements are not incompatible with federal law and do not unreasonably burden interstate commerce. *Id.* § 20106(a)(2)(A). The FRSA also preserves state causes of action for such violations of state law. *Id.* § 20106(b)(1)(C).

In 1993, the United States Supreme Court addressed the scope of FRSA preemption in a case involving a fatal truck–train collision. *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 661, 113 S. Ct. 1732, 1736 (1993). The driver's widow argued that the railroad had been negligent under Georgia law for failing to maintain adequate warning devices at the crossing and for operating the train at an excessive speed. *Id.* at 661, 113 S. Ct. at 1736. After finding that the grade crossing claim was not

preempted, the Court turned to the excessive speed claim. *Id.* at 673, 113 S. Ct. at 1742. The Court noted, "Federal regulations issued by the Secretary pursuant to FRSA and codified at 49 CFR § 213.9(a) (1992) set maximum allowable operating speeds for all freight and passenger trains for each class of track on which they travel." *Id.* The Court continued,

> On their face, the provisions of § 213.9(a) address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account. Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner.

*Id.* at 674, 113 S. Ct. at 1742. The Court added that federal regulations, "focus on providing appropriate warnings [at crossings] given variations in train speed." *Id.*, 113 S. Ct. at 1743. The Court went on: "Read against this background, § 213.9(a) should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." *Id.* at 675, 113 S. Ct. at 1743.

The Court specifically rejected the widow's argument that the conditions at a particular crossing amounted to an "essentially local safety hazard," thus permitting a different state-law negligence standard for train speed than the federal speed limit. *Id.*; *see also* 49 U.S.C. § 20106(a)(2)(A). As the Court explained,

> The state law on which respondent relies is concerned with local hazards only in the sense that its application turns on the facts of each case. The common law of negligence provides a general rule to address all hazards caused by lack of due care, not just those owing to unique local conditions.

*Id.* However, after suggesting that the law of negligence could *never* avoid preemption in an excessive speed case, the Court dropped a footnote:

> Petitioner is prepared to concede that the pre-emption of respondent's excessive speed claim does not bar suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard. As respondent's complaint alleges only that petitioner's train was traveling too quickly given the "time and place," this case does not present, and we do not address, the question of FRSA's pre-emptive effect on such related claims.

*Id.* n.15 (citations omitted).

To some extent, the jurisprudence of *Easterwood* has become the jurisprudence of footnote 15. What is "a specific, individual hazard"? Can weather conditions be considered "a specific, individual hazard"? And even if they are, what does that mean for preemption purposes? The Supreme Court didn't say that claims alleging excessive speed under state negligence law given the existence of a "specific, individual hazard" wouldn't be preempted, just that it wasn't deciding the issue.

One of the more comprehensive discussions of footnote 15 appears in *Seyler v. Burlington Northern Santa Fe Corp.*, 102 F. Supp. 2d 1226 (D. Kan. 2000). The case was brought by a passenger injured in a train derailment attributable to water overflowing the tracks. *Id.* at 1230–31. One of the passenger's claims was based on excessive speed. *Id.* at 1234. The passenger alleged that the train should have been proceeding more slowly given weather conditions and known flash floods in the area. *Id.* at 1235–36. The district court first surveyed the caselaw since *Easterwood* and noted, "Generally, courts which have considered this issue have ruled that a 'specific individual hazard' must be a discrete and truly local hazard such as a child standing on the railway." *Id.* at 1236. The court then disagreed that heavy rainfall combined with a flash flood warning could be considered "a 'specific, individual hazard' within the meaning of footnote 15 of *Easterwood*." *Id.* at 1237. Inclement weather is a common event and typically covers a broader geographical area than a particular

bridge or crossing; the Secretary of Transportation can take it into account when prescribing uniform national standards; and allowing state law to dictate a different, indeterminate speed limit in light of inclement weather would undermine the ability of the Secretary to prescribe uniform speed limits. *Id.* at 1236–38. The court went on to conclude that even if flash flood warnings could be considered a "specific, individual hazard" within the meaning of the Supreme Court's footnote 15, they would not amount to "an essentially local safety hazard" under the FRSA's own terminology and would still not be preempted. *Id.* at 1238.

Likewise, in *Cox v. Norfolk & Western Railway*, 998 F. Supp. 679, 685 (S.D.W. Va. 1998), the court reasoned that "specific, individual hazard" referred to something like a motorist stranded on the crossing, rather than weather conditions. The court elaborated,

> Furthermore, to claim that weather conditions were a specific, individual hazard as spoken of in *Easterwood*, would pave the way for infinite state negligence lawsuits involving train accidents occurring in less than perfect weather. Such a holding would act directly contrary to Congress' intent that laws, regulations and orders related to railroad safety be nationally uniform to the extent possible. 49 U.S.C. § 20106 (1997). Such a holding would also mean that the Secretary only took into account perfect weather conditions when the Secretary prescribed maximum speed limits.

*Id.*

The United States Court of Appeals for the Eighth Circuit has also held that weather conditions do not trump FRSA preemption. In *Grade v. BNSF Railway*, an automobile collided with a flatbed railcar that had been parked in a railroad crossing during a night when there was an ice storm and reduced visibility. 676 F.3d 680, 682 (8th Cir. 2012). The injured driver argued that his warning claims were not preempted, even though the railroad had complied with federal standards, because "a local condition existed at the B Street crossing, specifically, heavy fog and ice,

making it necessary for extra warnings to be in place." *Id.* at 686. The Eighth Circuit disagreed and found preemption:

> In implementing the national regulations, the Secretary of Transportation was surely aware that fog would exist along railroad tracks on many occasions and that ice storms would occur. These conditions are not uniquely local in character and could be adequately addressed at the national level. Thus, the local-condition savings clause does not apply, and the district court was correct in determining that Grade's inadequacy-of-warning claims were preempted by the FRSA.

*Id.* at 687.

One case takes a different view. *See Bakhuyzen v. Nat'l Rail Passenger Corp.*, 20 F. Supp. 2d 1113 (W.D. Mich. 1996). In that truck–train collision case, the court found that allegations the train should have slowed due to known dangers associated with the crossing were deemed preempted, but allegations that the train should have slowed because of weather were not. *Id.* at 1118. The court noted that weather conditions "are not static" and "are not capable of being adequately encompassed within uniform national standards." *Id.* "Maximum train speeds, like automobile speed limits, do not remove from the driver the obligation to exercise due care when and if the circumstances such as poor visibility due to snow make operation at the maximum speed careless." *Id.*

This reasoning, we believe, is open to question. Most courts disagree with *Bakhuyzen.* *See Carter v. Nat'l Ry. Passenger Corp.*, 63 F. Supp. 3d 1118, 1154 (N.D. Cal. 2014) ("[C]ourts have found that in general, adverse weather conditions do not constitute a specific, individual hazard under *Easterwood.*"); *Sec. First Bank v. Burlington N. & Santa Fe Ry.*, 213 F. Supp. 2d 1087, 1091–92 (D. Neb. 2002) (holding that limited visibility due to snow or blowing snow was not a specific, individual hazard and listing other district courts with the exception of *Bakhuyzen* that have rejected such claims); *Seronde v.*

*BNSF Ry.*, 2015 WL 1516534 at *2 (Ariz. Ct. App. April 2, 2015) ("Courts generally have held that ordinary visibility restrictions and adverse weather do not constitute 'specific, individual hazards' that may create an exception to preemption."). One can readily conceive of a national standard regarding train speed that would require weather-based adjustments, just as the existing standard requires track-based adjustments. But the Secretary might have concluded that the costs of such a standard do not justify the benefits because slowing down an entire train is, pace *Bakhuyzen*, different from slowing down a single automobile.

The words "specific, individual" and "essentially local" are ambiguous, although the layering of language suggests a narrow interpretation. Not only must the hazard be "specific," it must also be "individual." Not only must the hazard be "local," it must also be "essentially local." Some courts have focused on how likely the condition is to occur and in how many locations it is likely to occur. *See Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 640 (5th Cir. 2005) (finding that construction in the vicinity of a crossing does not exempt an excessive speed claim from preemption and stating, "A condition that can be or is present at many, or most sites cannot be a specific, individual hazard"); *Wooten v. CSX R.R.*, 842 N.E.2d 603, 609–10 (Ohio Ct. App. 2005) (holding that obstructive vegetation at a crossing was not a local safety hazard that foreclosed preemption of an excessive speed claim and stating, "Although this particular field of corn allegedly obstructed Wooten's view of the railroad tracks as she approached the crossing, corn fields can and do exist beside many crossings in Ohio").

An especially thorough discussion appears in a decision of the Wisconsin Supreme Court. *See Partenfelder v. Rohde*, 850 N.W.2d 896 (Wis. 2014). The case "stem[med] from a tragic collision between a train

and a minivan during a Memorial Day parade." *Id.* at 899. Local police notified the railroad in advance of potential hazards on the tracks near the parade. *Id.* Nonetheless, a vehicle became stuck on the tracks and was struck by a train. *Id.* In their lawsuit, the plaintiffs alleged that the railroad should have slowed their trains in response to the parade traffic, arguing that this was "a specific, individual hazard that removed the claims from the ambit of preemption." *Id.* at 906. After undertaking its own legal survey, the Wisconsin Supreme Court observed that courts "generally have interpreted the exception narrowly." *Id.* The court opined that a specific, individual hazard "(1) is a unique, particular danger rather than a 'generally dangerous condition'; (2) poses a danger of an imminent collision; and (3) 'cannot be addressed by a uniform, national standard.'" *Id.* at 907 (footnote omitted) (quoting *Anderson v. Wis. Cent. Transp. Corp.*, 327 F. Supp. 2d 969, 978 (E.D. Wis. 2004)). Otherwise stated, "a specific, individual hazard is something that is unique and could not have been taken into account by the Secretary when promulgating uniform, national standards." *Id.*; *see also Myers v. Mo. Pac. R.R.*, 52 P.3d 1014, 1028 (Okla. 2002) ("[A] specific, individual hazard refers to a unique occurrence which could lead to a specific and imminent collision.").

The court concluded that the parade was not such a specific, individual hazard. *Partenfelder*, 850 N.W.2d at 911. As it put it,

> For example, if the Elm Grove Police Department had called Soo Line and said that there was a van stuck on the tracks several miles ahead of the train, the van would have been a specific, individual hazard that could have caused an accident to be imminent as the train approached. The same is not true for traffic congestion. Even as a train approaches a crowded crossing, there is no imminent danger of a collision if motorists and pedestrians are following the law. Thus, even if an "event" can constitute a specific, individual hazard in some circumstances, neither the parade in this case nor its resultant traffic was such an event.

*Id.* at 908. The court cited to practical concerns that trains would have to slow down to an uncertain extent due to possible state tort liability whenever they received a warning about traffic congestion. *Id.* at 910–11.

We find these authorities persuasive, and in any event we are bound by the relevant text of the FRSA and the controlling Supreme Court decision in *Easterwood*. Common weather conditions like fog cannot be a basis for setting aside the national train speed limits established by the Secretary of Transportation. They appear too frequently and over too wide a geographic area to be considered "essentially local" or "specific [and] individual." *See* 49 U.S.C. § 20106(a)(2)(A); *Easterwood*, 507 U.S. at 675 n.15, 113 S. Ct. at 1743 n.15. If weather conditions were an exception to preemption that opened the door to each state's tort law, the exception would come close to swallowing the rule. Congress's mandate that "[l]aws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable" would be undermined. 49 U.S.C. § 20106(a)(1). Weather conditions are the kind of thing that the Secretary *could* have taken into account in the federal train speed regulations if the Secretary wished to do so. *See Grade*, 676 F.3d at 687; *cf.* Iowa Code § 321.285(1) (2013) (stating that "no person shall drive any vehicle upon a highway at a speed greater than will permit the person to bring it to a stop within the assured clear distance ahead, such driver having the right to assume, however, that all persons using said highway will observe the law"). Fog is not unique, it isn't an imminent danger, and it isn't the kind of thing that could not be addressed in a national standard. *See Partenfelder*, 850 N.W.2d at 907.

*Easterwood* also emphasizes that the Secretary of Transportation has made a policy decision to require appropriate warnings to drivers at

crossings rather than train speed changes. *See* 507 U.S. at 674, 113 S. Ct. at 1742–43 ("Because the conduct of the automobile driver is the major variable in grade crossing accidents, and because trains offer far fewer opportunities for regulatory control, the safety regulations established by the Secretary concentrate on providing clear and accurate warnings of the approach of oncoming trains to drivers.").

Accordingly, we find that Wermerskirchen's excessive speed claims are preempted by federal law, given 49 U.S.C. § 20106 and the undisputed evidence that the train was operating in compliance with federal speed limits.

A careful reading of the court of appeals decision indicates that the court did not reverse the district court on Wermerskirchen's claim that the train was traveling at an excessive speed given the weather. The court of appeals said, "[W]e don't decide the dense fog, standing alone, was a 'specific individual hazard' as that phrase was used in *Easterwood*." Instead, the court gave the following rationale for its ruling:

> The district court should have denied summary judgment on Wermerskirchen's claims the crew failed to maintain a proper lookout and failed to slow or stop the train. The question whether the grader presented an imminent risk of collision, once the train crew was able to perceive it, is a question of fact for a jury.

We now turn to the lookout and braking claims.

**B. Summary Judgment Was Properly Granted on the Lookout and Braking Claims Based on Lack of Causation**. We agree with the court of appeals that a vehicle visibly entering a crossing is both a "specific, individual" hazard and an "essentially local" hazard. As that court colorfully explained, if the rule were otherwise, "as long as the train was traveling within applicable federal speed limits, Dorsey and Yokem could

have been wearing blindfolds or had their backs turned without being responsible under a state law negligence action."

Thus, for example, in *Partenfelder v. Rohde*, the Wisconsin Supreme Court remanded for consideration of "the train crew's response once it saw [plaintiff's] van." 850 N.W.2d at 911. That claim was not preempted. *Id.* Another court very recently concurred in this view: "[A] claim of failure to slacken speed based on the unwavering approach by a vehicle at a railroad crossing is not preempted." *Campbell v. Union Pac. Ry.*, ___ S.W.3d ___, ___ (Mo. Ct. App. 2020); *see also Hesling*, 396 F.3d at 640 (explaining that the specific, individual hazard "relates to the avoidance of a specific collision" (quoting *Armstrong v. Atchison, Topeka & Santa Fe Ry.*, 844 F. Supp. 1152, 1153 (W.D. Tex. 1994))); *Williams v. Norfolk S. Corp.*, 322 F. Supp. 3d 896, 902 (N.D. Ind. 2018) ("[A]ny claim that the train was traveling at an excessive speed is preempted, except Williams' negligence claim based on Norfolk's duty to stop or slow the train in response to the specific, individual hazard posed by the presence of Williams and his friends."); *Stouffer v. Union Pac. R.R.*, 530 S.W.3d 782, 792 (Tex. App. 2017) ("The classic examples of a specific, individual hazard are a child standing on the tracks or a motorist standing on the tracks.").

So the FRSA does not preempt Wermerskirchen's claims that the train crew didn't timely spot him once he could have been seen and that they didn't timely brake the train. The district court, however, granted summary judgment here based on causation. It reasoned,

> By the time that Defendants could have taken any of those actions, the train and the road grader were already in too close of proximity to each other for those attempts to make any difference in the result. This conclusion is reached by both Plaintiff and Defendant experts. The train was simply moving too fast, and the visibility was too poor.

We believe the summary judgment record supports that ruling. Wermerskirchen's expert stated in his report: "Giv[en] the speed and limitations of visibility, even maintaining a proper lookout would not provide the crew with sufficient time to perceive the risk, react, and initiate braking to avoid the collision." CCP's expert concurred:

> Even an instantaneous reaction by the crew when the grader failed to yield as required and went past the crossbuck onto and stopped on the crossing would have yielded no measurable change in the train's arrival time at the point of impact.

The undisputed evidence showed that a full brake application at six seconds before impact—when the grader first could have been seen— would not have avoided the collision and would have reduced the speed of the train from only forty-seven miles per hour to forty-six miles per hour.

Wermerskirchen advances two arguments on appeal. First, he questions the stopping-distance calculations offered by CCP's expert. Second, Wermerskirchen contends that if the train crew had commenced braking and if he had noticed that the train was slowing down, he might have sped up and been able to get across the tracks.[6] Both of these are only arguments, however. Wermerskirchen did not offer different calculations from his own expert or an affidavit that he might have made a different split-second decision to try to beat the train, let alone proof that this would have been possible. From the video, it seems highly implausible that there could have been a different outcome once Wermerskirchen decided to enter the crossing, given the speed with which the train was traveling. Wermerskirchen's hypotheses are not enough to generate a genuine issue of material fact. *See* Iowa R. Civ. P. 1.981(5) ("When a

---

[6]Wermerskirchen testified that once he saw a collision was imminent, he stopped the grader on the tracks so that the cab in which he was riding would not directly receive the impact.

motion for summary judgment is made and supported as provided in this rule, . . . the response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

Insisting otherwise, Wermerskirchen analogizes this case to *Dresser v. Union Pacific Railroad*, 809 N.W.2d 713 (Neb. 2011). The analogy does not hold up. *Dresser* involved a collision at a crossing between a train and an automobile. *Id.* at 715. Unlike in the present case, though, it happened in the middle of a clear day. *Id.* at 716. The Nebraska Supreme Court agreed it was undisputed that the train could not have been stopped in time once it became clear the vehicle was pulling onto the tracks. *Id.* at 721. However, the court found an issue of fact as to whether *slowing* the train could have given the driver of the vehicle enough time to back off the tracks and avoid he collision. *Id.* at 721–22. The court specifically noted that the record,

> is silent on what effect activation of the emergency brake would have had on the speed of the train. It is thus impossible to conclude on this record that the train's speed could not have been reduced had the engineer pulled the emergency brake immediately after the vehicle left the stop sign.

*Id.* at 721. No such gap exists in the present record. There is unrebutted testimony that activating the brake would have slowed the train's speed by only one mile per hour.

"Tortious conduct must be a factual cause of harm for liability to be imposed. Conduct is a factual cause of harm when the harm would not have occurred absent the conduct." Restatement (Third) of Torts: Phys. & Emot. Harm § 26, at 346 (Am. L. Inst. 2010). Wermerskirchen has failed to raise an issue of fact that a better lookout or earlier application of the brakes would have avoided his serious injuries.

"Factual cause" used to be called (with no less clarity) "cause in fact." *See, e.g.*, *Berte v. Bode*, 692 N.W.2d 368, 372 (Iowa 2005). Regardless, the absence of such a causal connection has sustained summary judgment in a number of train-crossing collision cases. For example, in *Rasmusen v. White*, a federal district court found that a train crew breached a duty to apply the brakes when it became apparent that the plaintiff's car was not going to stop before entering a crossing, but the court nonetheless granted summary judgment to the defendants. 970 F. Supp. 2d 807, 825 (N.D. Ill. 2013). The court explained,

> [T]here is simply no evidence that had the train crew attempted to stop the train at the point when it became their duty to do so that the collision could have been avoided. In situations where the evidence indicates that the train crew could not have prevented the accident after realizing that a vehicle is not going to yield to the train, summary judgment is warranted. Thus, based on the record before the Court, the train crew's breach of that duty of care cannot be the proximate cause of the accident. Summary judgment must thus be granted as to those negligence claims based on the train crew's failure to brake or to keep an appropriate lookout.

*Id.*

Likewise, in *Pratt v. National Railroad Passenger Corp.*, a federal appellate court affirmed summary judgment on a failure-to-brake claim on causation grounds. 709 F. App'x 33, 35 (2d Cir. 2017). The court agreed with the manner in which the district court had sifted through the record:

> Absent expert testimony to the contrary, the district court did not err in adopting the defense expert's computation of the effect of such braking, which indicated that three seconds of braking would have slowed the train by two miles per hour and would have resulted in the train reaching the decedent's position at the intersection mere hundredths of a second later than it did. That sliver of time falls far short of the one second that the decedent would have needed to escape harm's way, regardless of whether he was continuing at his normal walking pace or diving out of the train's path immediately before impact. We find no error in the district

court's conclusion that a reasonable juror could not find that this difference would have been enough to avoid the collision.

*Id.*

In *Illinois Central Gulf Railroad v. Travis*, the Mississippi Supreme Court held that the railroad should have been granted judgment notwithstanding the verdict in a train-pickup collision case. 106 So.3d 320, 323 (Miss. 2012) (en banc). On the failure-to-brake claim, the court noted that

> even if the emergency brakes had been applied at the whistle sign, which was 960 feet from the crossing, the train would have reached the crossing only one half second later than if the brakes had not been applied, which certainly would not have prevented, or even lessened, the accident.

*Id.* at 331 (footnote omitted).

Again, the undisputed record evidence indicates that the promptest possible crew response could have slowed the train's speed when it reached the crossing by at most *one mile per hour*. Doing the math, this would have delayed the train's arrival at the crossing by no more than about *a tenth of a second.*[7]

We reiterate that courts should decide causation as a matter of law "only in exceptional cases." *Crow v. Simpson*, 871 N.W.2d 98, 105 (Iowa 2015). This is an exceptional case. The district court properly granted summary judgment on the lookout and braking claims based on lack of causation.

---

[7]We will assume the grader became visible when it was 500 feet away. This is consistent with plaintiff's expert report as to the visibility that day. It also means the grader would have become visible seven seconds before the collision, which the video generally supports (although six seconds might be closer). If braking could have slowed the train during that time from forty-seven miles per hour to forty-six miles per hour, the difference in transit time to reach the grader would have been less than one-tenth of a second. (At 47 miles per hour, the train would have taken 7.25 seconds to cover 500 feet. At an average speed of 46.5 miles per hour, the train would have taken 7.33 seconds to cover 500 feet.)

**IV. Conclusion.**

For the foregoing reasons, we affirm the decision of the court of appeals on the trial issues, vacate the decision of the court of appeals on the partial summary judgment ruling, and affirm the judgment of the district court.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

Waterman, McDonald, Oxley, and McDermott, JJ., join this opinion. Appel, J., files an opinion concurring in part and dissenting in part. Christensen, C.J., takes no part.

#18–2039, *Wermerskirchen v. Canadian Nat'l R.R.*

**APPEL, Justice (concurring in part and dissenting in part).**

Tragic accidents at railroad crossings have long appeared before the courts. This case raises several interesting issues arising in light of the passage of the Federal Railroad Safety Act of 1970 (FRSA). Pub. L. No. 91–458, 84 Stat. 971 (1970) (originally codified at 45 U.S.C. §§ 421–441 (1976), now codified as amended in scattered sections of 49 U.S.C. §§ 20101–21311).

For the reason expressed below, I conclude that the plaintiff's excessive speed claim based upon existing conditions (dense fog) is not preempted by the FRSA. This view is powered by the FRSA's safety purpose and by the presumption that state law is not preempted, particularly in areas of the historic police powers of the states. Neither of these concepts appears in the majority's analysis.

I concur, however, in the majority's view that the defendant was entitled to summary judgment on the plaintiff's claims based upon improper lookout and failure to brake. On the unusual record developed in this case, plaintiff's failed to raise a triable issue on causation on these theories.

**I. Factual and Procedural Background.**

On January 28, 2013, Richard Wermerskirchen was operating a thirty-eight-foot road grader in Black Hawk County. Wermerskirchen was roughing up ice on county roads. He approached a railroad crossing with his vehicle. The crossing had passive signage but no controlled gating. Fog had settled into the area, severely limiting visibility.

According to Wermerskirchen, after looking to see if there was an approaching train and hearing no horn or other warnings, he slowly rolled his grader forward to cross the tracks. When the front of the grader was

over the first rail of the track, Wermerskirchen says a train operated by the defendant suddenly emerged from the fog and was traveling toward him at what Wermerskirchen called "a substantial rate of speed." According to Wermerskirchen, the train that was not there a second before, appeared "out of the fog like black death." Wermerskirchen decided to stop the grader rather than attempt to proceed through the intersection, fearing that if he attempted to proceeded or accelerate through the intersection, the cab of his vehicle, and his person, would be put in the direct path of the oncoming locomotive.

A collision occurred. Wermerskirchen was thrown from his grader and landed on the grass with a chunk of metal on his legs. After the accident, one of the train crew members approached him. The crew member asked Wermerskirchen questions about the location. According to Wermerskirchen, the crew member "wasn't sure where we were at" and "[h]e was confused as to our location." Wermerskirchen suffered serious injuries as a result of the collision.

Wermerskirchen and his spouse brought an action against the defendants. In their petition, as amended, they alleged that the defendants were negligent for (1) operating the train at an excessive speed under the circumstances, (2) failing to maintain a proper lookout, (3) failing to apply brakes in a proper manner, and (4) failing to sound an audible warning sufficiently in advance of the crossing. After the parties retained experts and engaged in discovery, the defendant moved for summary judgment on all claims.

The defendant moved for summary judgment on the ground that the plaintiffs' claims were all preempted by regulations promulgated by the Secretary of Transportation pursuant to the FRSA. The district court found that the excessive speed claim was preempted. The district court

also granted summary judgment on plaintiff's claims regarding failure to maintain a proper lookout and failure to apply brakes in a timely manner, either on preemption or on causation theories. The district court denied summary judgment on the question of whether the horn was operating properly or in compliance with applicable federal regulations. After trial, a jury returned a verdict in favor of the defendants on the horn claim.

Plaintiffs appealed. The court of appeals did not directly address the excessive speed under the conditions claim, but the court impliedly rejected it by concluding that the plaintiffs' claims of improper lookout and failure to brake were not preempted. Further, the court of appeals determined that the plaintiffs were not entitled to summary judgment on the improper lookout and failure to brake theories based upon lack of causation. The court of appeals rejected plaintiffs' claim of various errors in connection with the trial on the horn claim.

## II. Legal Framework for Applying Federal Preemption of Traditional State Tort Law.

The United States Supreme Court has recognized that under the Supremacy Clause, state law may be preempted by federal law under three theories. Congress may expressly preempt state law. *See, e.g.*, *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79, 110 S. Ct. 2270, 2275 (1990). Preemption may also be implied through the theories of conflict preemption and field preemption. Conflict preemption arises when a state law "actually conflicts" with federal law. *See, e.g., id.* at 79, 110 S. Ct. at 2275. Field preemption occurs where the regulation is so pervasive that Congress must have intended to displace state law by occupying the entire field of potential regulation. *See, e.g.*, *Cipollone v. Liggett Grp. Inc.*, 505 U.S. 504, 516, 112 S. Ct. 2608, 2617 (1992); *Griffioen v. Cedar Rapids &*

*Iowa City Ry.*, 914 N.W.2d 273, 291 (Iowa 2018) (Appel, J., dissenting); *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 75 (Iowa 2014).

But federal preemption of state law raises serious problems of federalism. As a result, it has "long been settled" that a preemption analysis begins with the presumption that federal statutes do not preempt state law. *Bond v. United States*, 572 U.S. 844, 858, 134 S. Ct. 2077, 2088 (2014); *State v. CSX Transp., Inc.*, 154 N.E.3d 327, 331 (Ohio Ct. App. 2020).

Not only is there a presumption against preemption of state law, the standard for overcoming the presumption is quite high in some contexts. Specifically, in *Rice v. Santa Fe Elevator Corp.*, the Supreme Court declared that preemption analysis begins "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." 331 U.S. 218, 230, 67 S. Ct. 1146, 1152 (1947). A traditional exercise of the state's "police powers" is "to protect the health and safety of their citizens." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 116 S. Ct. 2240, 2245 (1996). Against this caselaw, it is not surprising that the Supreme Court has declared that "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77, 129 S. Ct. 538, 543 (2008) (quoting *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449, 125 S. Ct. 1788, 1801 (2005)).

In addition, the Supreme Court has emphasized the importance of the statutory purpose in evaluating preemption claims. "[T]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S. Ct. 1187, 1194 (2009) (quoting *Medtronic*, 518 U.S. at 485, 116 S. Ct. at 2250).

So the clear thrust of the United States Supreme Court preemption cases is to disfavor preemption of historic state police power and require a "clear and manifest" intent before preemption occurs, to construe any ambiguities against preemption, and to consider the purpose of the statute as a touchstone in the application of these very demanding preemption standards.

**III. The Purpose of the Federal Railroad Safety Act: "Promote Safety in Every Area of Railroad Operations."**

The FRSA was originally enacted in 1970. Pub. L. No. 91–458, 84 Stat. 971. Congress enacted the FRSA to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101 (2018). Any interpretation of the provisions of the FRSA must be conducted against the backdrop of the declared Congressional purpose of promoting railroad safety "in every area" of railroad operations. An interpretation of the FRSA that does not promote railroad safety is, at a minimum, suspect.

In order to promote safety in every area of railroad operations, the FRSA authorized the Secretary of Transportation to study and develop solutions to problems posed by grade crossings. Pub. L. 91–458, § 204, 84 Stat. at 972 (originally codified at 45 U.S.C. § 433 (1976), now codified as amended at 49 U.S.C. § 20134 (2018)). In addition, the FRSA gave the Secretary broad powers to "prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety." *Id.* § 202(a), 84 Stat. at 971 (originally codified at 45 U.S.C. § 431(a) (1976), now codified as amended at 49 U.S.C. § 20103 (2018)). The FRSA contained express preemption and saving clauses. *Id.* § 205, 84 Stat. at 972 (originally codified at 45 U.S.C. § 434 (1976), now codified as amended at 49 U.S.C. § 20106 (2018)).

The states were permitted to maintain local law related to railroad safety "until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement." *Id.* The phrase "covering the subject matter" makes it clear that preemption is not to be implied or to arise from field preemption.

Further, under the FRSA, states were expressly permitted to maintain more stringent safety requirements when "necessary to eliminate or reduce" local safety hazards if those standards were "not incompatible with a law" and not unduly burdensome on interstate commerce. *Id.*

The Secretary, acting through the Federal Railroad Administration, promulgated regulations entitled "Track Safety Standards." 49 C.F.R. § 213 (2012). The Track Safety Standards regulations set "minimum safety requirements for railroad track that is part of the general railroad system of transportation." *Id.* § 213.1(a). The Track Safety Standards regulations caution that "[i]n general, the requirements prescribed in this part apply to specific track conditions existing in isolation." *Id.* As a result, "a combination of track conditions, none of which individually amounts to a deviation from the requirements in this part, may require remedial action to provide for safe operations over that track." *Id.*

The Track Safety Standards regulations includes a section entitled "Classes of track: operating speed limits." *Id.* § 213.9. This section provides graduated speed limits based on track classification. *Id.* The track classifications in turn are based on physical characteristics of the track. *See id.* at §§ 213.51–.143. The Track Safety Standards regulations provide for penalties for violations but no remedy for a person who is injured as a result of violation of the maximum speed limits. *See id.* at 213.15.

**IV. The Ambiguous Case of *CSX Transportation, Inc. v. Easterwood*: To What Extent is Traditional State Power Preempted by Trace Standard Regulation.**

**A. Introduction.** The United States Supreme Court considered a case involving the provisions of the FRSA in *CSX Transportation, Inc. v. Easterwood.* 507 U.S. 658, 661, 113 S. Ct. 1732, 1736 (1993). In *Easterwood,* a driver of a truck was killed when a train collided with his vehicle at a railroad crossing. *Id.* In *Easterwood,* the deceased's representatives claimed that the railroad breached its common law duty to operate its train at a moderate and safe rate of speed. *Id.* The railroad countered that the state common law claim was preempted by the federal speed limitations in the Track Safety Standards regulations under 49 C.F.R. section 213.9 (1992). *Easterwood,* 507 U.S. at 665, 673, 113 S. Ct. at 1738, 1742.

**B. Majority opinion.** The *Easterwood* Court determined that the question of whether federal regulations preempted state law should be determined not by whether the regulations merely "touch upon" or "relate to" the subject matter of state law. *Id.* at 664, 113 S. Ct. at 1738. Instead, the *Easterwood* Court emphasized that the statutory term " 'covering' is a more restrictive term which indicates that pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Id.*

In turning to the question of whether the plaintiff's excessive speed claim was preempted by the Track Safety Standards regulations, the *Easterwood* Court recognized that "[o]n their face", the regulations address "only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate." *Id.* at 674, 113 S. Ct. at 1742. Further, the *Easterwood* Court recognized that the regulations were adopted "only after the hazards posed by track conditions were taken into

account." *Id.* Thus, the *Easterwood* Court recognized that the nature of the Secretary's inquiry was track conditions and that the maximum speeds were determined based on the nature of the track.

Based on this language, one would have thought that the Track Safety Standards regulations, which dealt only with the subject of maximum speeds arising in the context of track conditions, would not lead to broad preemption of state common law claims not addressing track conditions. By analogy, a state speed limit of sixty-five miles per hour on a highway does not mean that a motorist does not breach a common law duty of care by driving sixty-four miles per hour on a highway when weather conditions make traveling at that speed unreasonable.

But the *Easterwood* Court declared that the speed limits in the Track Safety Standards regulations "must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose." *Id.*[8] The *Easterwood* majority noted that the Secretary had promulgated regulations related to warnings of the approach of oncoming trains to drivers. *Id.* at 674, 113 S. Ct. at 1742–43. But then, the *Easterwood* Court declared that the applicable regulation should be understood as "covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." *Id.* at 675, 113 S. Ct. at 1743. This sentence appears to limit the scope of preemption to claims arising from the nature of grade

---

[8]The Supreme Court in *Easterwood* did not describe the nature of the plaintiff's state common law claim. The district court in the case stated that,

> The plaintiff alleges that CSXT was negligent in failing to install gate arms at the . . . crossing, in operating the train at an unsafe speed, and in allowing vegetation to grow along the side of the track thus preventing Easterwood from seeing the train.

*Easterwood v. CSX Transp., Inc.*, 742 F. Supp. 676, 678 (N.D. Ga. 1990).

crossings, which, apparently, are "covered" by a regulation relating to "track conditions."

The *Easterwood* Court next turned to the saving clause of the statute. *Id.* The *Easterwood* Court rejected the application of the savings clause in the case, noting that the common law of negligence was "a general rule [addressing] all hazards caused by lack of due care, not just those owing to unique local conditions." *Id.*

What precisely was meant by "a general rule addressing all hazards" was not clear. And to the extent the Supreme Court was relying on "unique" local conditions, it erred. The legislative history shows that the railroads attempted to limit the savings clause to "uniquely" local conditions, but Congress refused to do so, instead adopting the language " 'essentially' local safety hazard." *See Union Pac. R.R. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851, 859 (9th Cir. 2003).

Then, at the end of the opinion, the *Easterwood* majority drops footnote 15. *Easterwood*, 507 U.S. at 675 n.15, 113 S. Ct. at 1743 n.15. In the footnote, the *Easterwood* Court noted:

> Petitioner is prepared to concede that the pre-emption of respondent's excessive speed claim does not bar suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard. As respondent's complaint alleges only that petitioner's train was traveling too quickly given the "time and place," this case does not present, and we do not address, the question of FRSA's pre-emptive effect on such related claims.

*Id.* (citations omitted). The footnote passage does not indicate whether a claim "such as" the failure to slow or stop might not be preempted because it was not "covered" by the Secretary's regulations or was within the scope of the exclusion of preemption reserved for "essentially local safety hazards." The *Easterwood* Court uses the term "such as" to describe nonpreempted claims, thereby implying that claims other than those

involving "a specific, individual hazard" may be pursued, but the Court provides no elaboration. The phrase "specific, individual hazard" in the footnote is not found in the FRSA or in the Track Safety Standards regulations.

The bottom line in the *Easterwood* majority is that the Track Safety Standards regulations preempt "general" negligence claims "of the sort" presented but not related tort duties "such as" the duty to slow or stop as a result of an "individual, specific hazard." And, it is important to point out that the plaintiff's claim in *Easterwood* did not involve limited visibility due to dense fog or other climate conditions. Whether claims of negligence based upon the assertion that a train was traveling too fast in light of lack of visibility due to climate conditions is thus an open question after *Easterwood*.

**C. Justice Thomas' Dissenting Opinion.** Justice Thomas, joined by Justice Souter, filed a concurrence in part and dissent in part. *Id.* at 676, 113 S. Ct. at 1744 (Thomas, J., concurring in part and dissenting in part). Justice Thomas noted that the Secretary's regulations only addressed the nature of the track upon which the trains operated and, as a result, the Secretary has not even considered crossing safety. *Id.* According to Justice Thomas, the Secretary's regulations should be understood as "covering the subject matter of train speed with respect to track conditions." *Id.* at 678, 113 S. Ct. at 1745. Justice Thomas emphasized that "[t]o read the Secretary's existing maximum speed regulation as encompassing safety concerns unrelated to track characteristics, however, negates Congress' desire that state law be accorded 'considerable solicitude.' " *Id.* at 679, 113 S. Ct. at 1745.

**D. Tension and Uncertainty.** The *Easterwood* majority opinion is not a model of clarity. It uses language of limitation in places, and yet it

appears to extend preemption beyond the express terms of the Track Safety Standards regulations. For instance, although the *Easterwood* majority demands that in order for preemption to occur, a regulation must be "covering" the "subject matter," the majority provides no guidance as to determining the level of generality in what "subject matter" of a regulation means for preemption purposes. But preemption, apparently, clearly extends beyond the express terms of the regulation to extinguish some, but clearly not all, state tort law claims.

In my view, Justice Thomas has the stronger position. The subject of speed related to track design was clearly covered by the Track Safety Standards regulations, but it seems doubtful that the speed regulations related to track design preempts all other speed regulations.

Nonetheless, in deciding this case, we are bound by federal law as declared by the United States Supreme Court. We cannot decline to follow Supreme Court precedent in the interpretation of federal law because we think it is wrong. Yet, the United States Supreme Court in *Easterwood* opened the door to the claims made by the Wermerskirchen's in this case through footnote 15 and other language in the opinion. The question is whether we can, in this case, permit the plaintiff's claims to proceed in light of the Supreme Court's ambiguous decision in *Easterwood*.

In my view, there is room to maneuver here. For instance, footnote 15 does not expressly endorse state regulation of speeds beyond that established in the Secretary's regulations, but it clearly provides a limitation of the scope of the holding in *Easterwood*. In order to gain perspective on the question of whether footnote 15 or any other limiting language has any vitality and, if so, when it applies, I look to lower court decisions since *Easterwood* to provide perspective and to inform my judgment on the issues.

**V. Lower Court Case Law Related to FRSA Preemption Coverage and the Essentially Local Hazard Saving Clauses**.

**A. Introduction.** There are two related but distinct lines of inquiry in the preemption analysis under the FRSA. The first question is whether the state common law tort claim is covered by the applicable federal regulation. In this analysis, we should generally construe federal preemption narrowly and strive to give recognition to the traditional state interests behind its tort system. *Rice,* 331 U.S. at 230, 67 S. Ct. at 1152.

The second question is whether the state common law tort claims falls within the exception for "essentially local hazards." While preemption is disfavored for traditional state law claims, there is authority for the proposition that exceptions to preemption are to be narrowly construed.

The post-*Easterwood* caselaw tends to merge the two concepts together. In the analysis that follows, I tear them apart and give them independent consideration. *See Dresser v. Union Pac. R.R.,* 809 N.W.2d 713, 722–23 (Neb. 2011) (distinguishing between coverage of statute and exception to statute for "essentially local safety or security hazard" (quoting 49 U.S.C. § 20106(a)(2))).

One further introductory point is worth making. The lower federal courts largely ignore the safety purpose of the statute and the principles of preemption. The cumulative effect of ignoring the congressionally expressed safety purpose and the Supreme Court's preemption precedents have made the lower courts more open to finding FSLA preemption than if they would have been attentive to purpose and preemption precedents.

**B. Coverage of the Same Subject Matter Cases.** There are a couple dozen cases since *Easterwood* grappling with the question of to what extent local regulation of speed might be permitted in light of the Secretary's regulation of speed based on track design. Many of the cases

involved claims that speeds of trains should have been reduced based upon fixed design features or fixed features of the environment that are present day after day.

In cases involving fixed features related to train crossings, federal courts have generally found the FRSA preempts local regulation. For example, in *Herriman v. Conrail, Inc.*, the court found lighting conditions at a railroad crossing to be a generalized feature that would require every engineer to slow at the crossing rather than involving an individual hazard requiring judgment by a specific engineer. 883 F. Supp. 303, 305, 307 (N.D. Ind. 1995). The problem in *Herriman* did not exist solely on the night of the accident but was continuously present at the crossing. *Id.* at 307. Similarly, in *Armstrong v. Atchison, Topeka & Santa Fe Railway*, the federal district court found preemption of claims related to the grade of a "crossing in a high vehicular traffic area which was not equipped with an automatic gate with flashing light signals." 844 F. Supp. 1152, 1152–53 (W.D. Tex. 1994). The alleged problems were general problems, present day in and day out, that related to fixed conditions on the railroad's right of way. *Id.*; *see also Alcorn v. Union Pac. R.R.*, 50 S.W.3d 226, 242 (Mo. 2001) (en banc) ("[C]ases that involve warning devices, grade, angle, and proximity to highways are all general conditions that are amenable to uniform, national standards and are, therefore, preempted."), *overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. 2013) (en banc). In these cases, the Track Safety Standards regulations are stretched to "cover" subject matter beyond the track itself and to include other physical features associated with the track.

Query whether the extension of coverage of the Track Safety Standards regulations to include additional physical characteristics of the railway is correct. Is it "clear and manifest" that the Track Safety

Standards regulations, based solely on engineering considerations arising from the physical features of the track itself, should be interpreted to "cover" other "subject matter" that includes non-track physical features like the configuration of railroad crossings?  *See Rice*, 331 U.S. at 230, 67 S. Ct. at 1152.

But what about cases that involve fleeting or transient conditions or causes that are not fixed and present on a daily basis?  Here, there is some variation even in the federal lower court case law.  For example, a claim arising from improperly parked tank cars has been held to not involve a fixed feature of the track and the related right of way and therefore not subject to federal preemption under the Track Safety Standards regulations.  *See Mo. Pac. R.R. v. Lemon,* 861 S.W.2d 501, 509–10, 514 (Tex. App. 1993).  In my view, a fleeting or transient condition is not the kind of condition regulated by the Track Safety Standards regulations.

Another aggressive approach to preemption under the FRSA based on the Track Safety Standards regulations may be found in *O'Bannon v. Union Pacific Railroad.*  960 F. Supp. 1411 (W.D. Mo. 1997).  *O'Bannon* involved a railroad crossing collision where the plaintiff claimed negligence based upon limited signage, poor angles, excessively steep grade, and the presence of vegetation.  *Id.* at 1415.  The *O'Bannon* court found that the Track Safety Standards regulations preempted the plaintiff's claims.  *Id.* at 1421–23.  Among other things, the *O'Bannon* court suggested that preemption would occur if the subject matter was capable of being adequately encompassed within uniform national standards.  *Id.* at 1422–23.

The notion that preemption occurs because the Secretary might have promulgated a regulation covering the subject matter is extraordinary.  The statute expressly requires that a regulation actually

cover the subject matter in order to preempt local law. 49 U.S.C. § 20106(a)(2) ("A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary . . . prescribes a regulation or issues an order covering the subject matter of the State requirement."). But under *O'Bannon*, there is no analysis of whether a regulation actually "covers" the "subject matter" of state tort law. Instead, the question under *O'Bannon* is whether the Secretary could have hypothetically decided to promulgate a uniform regulation of the subject matter. *O'Bannon*, 960 F. Supp. at 1423; *see also Bowman v. Norfolk S. Ry.*, 832 F. Supp. 1014, 1018 (D.S.C. 1993). But that proposition is too broad. The question is not whether the Secretary could promulgate a rule but whether the rule, which was actually promulgated, "covers" the "subject matter" of the local law—a much narrower proposition. I therefore do not rely on *O'Bannon* and its progeny in analyzing the preemption issues in this case.

**C. Essentially Local Hazard Exception Cases.** A number of cases deal with the "essentially local hazard" exception to FRSA preemption. Some courts that apply preemption to FRSA claims emphasize that in order to qualify for the exemption, the event or incident must be "unique." *See, e.g., Grade v. BNSF Ry.*, 676 F.3d 680, 686 (8th Cir. 2012) ("[C]onditions are not uniquely local in character . . . ."); *Cox v. Norfolk & W. Ry.*, 998 F. Supp. 679, 683 (S.D.W. Va. 1998) (citing need for "unique local conditions" (quoting *Easterwood*, 507 U.S. at 675, 113 S. Ct. at 1743)). There is a passing reference in *Easterwood* to "unique local conditions." 507 U.S. at 675, 113 S. Ct. at 1743.

But the "unique" approach is wrong. As was noted in *Union Pacific Railroad v. California Public Utilities Commission*, the railroads lobbied Congress to limit the preemption exception to "uniquely" local hazards,

but Congress declined. 346 F.3d at 859. Instead, Congress enacted an exception for what is "essentially local safety hazards." *Id.* According to the *Union Pacific* court, the substitution of the term "essentially" for "uniquely" implied that the condition need not be unique in order to be local. *Id.* The *Union Pacific* court stated that the term "essentially local safety hazard" was one that ordinarily should be dealt with at the local level. *Id.* at 860. The *Union Pacific* court repeated the erroneous principle that local law might be preempted if it might have been addressed in a nationwide regulation. *Id.*

### VI. FRSA Preemption Cases Involving Climate Conditions.

There are only a handful of cases dealing with the question of whether state law claims that a train's speed was excessive due to existing weather conditions are preempted.

**A.** ***Bakhuyzen v. National Rail Passenger Corp.*** *Bakhuyzen v. National Rail Passenger Corp.* involved a case where a driver of a propane truck was struck by an Amtrak train. 20 F. Supp. 2d 1113, 1115 (W.D. Mich. 1996). The plaintiff alleged that the train was traveling too fast for conditions. *Id.* The plaintiff's expert identified as "specific, individual conditions" including the limited visibility due to "snowy weather conditions." *Id.* at 1117.

The *Bakhuyzen* court held that the plaintiff's claim was not preempted by the FRSA. *Id.* at 1118. The *Bakhuyzen* court contrasted the case with *Herriman*, which involved a claim based on the fixed feature of lighting at a railroad crossing. *Id.* (citing *Herriman*, 883 F. Supp. at 307). In contrast to "dangerous crossing allegations" where the claim is made that the crossing is dangerous, day in and day out, the *Bakhuyzen* court noted that "weather conditions are not static" and thus the case was distinguished from the dangerous crossing cases. *Id.* at 1117–18.

**B.** ***Cox v. Norfolk and Western Railway.*** In *Cox,* the district court considered FRSA preemption in light of climate related claims. 998 F. Supp. at 687. Specifically, the *Cox* court rejected a claim that snow covered tracks were "a specific, individual hazard." *Id.* at 684–85. The *Cox* court further found claims that the defendant failed to slacken speed due to weather conditions at the time of the accident also failed. *Id.* at 686–88.

In *Cox,* it was undisputed that the train was traveling at a speed of approximately thirty miles per hour immediately prior to the accident and that the maximum speed authorized under the Track Safety Standards regulations was forty miles per hour. *Id.* at 684. The plaintiff claimed that he had "presented a question as to whether the speed of the train which struck Mr. Cox was appropriate given the existing weather conditions." *Id.*

In considering whether the claim was within the "specific, individual hazard" exception to FRSA preemption, the *Cox* court first addressed the plaintiff's pleading. *Id.* at 685. The *Cox* court noted that as pled, the plaintiff framed the issue as "whether the train's speed was appropriate" and not "whether the defendant was negligent in failing to slow down or stop to avoid a specific, individual hazard." *Id.* at 684–85. The *Cox* court was impliedly holding that the excessive speed under the conditions claim was "covered" by the Track Safety Standards regulations and that in order to avoid federal preemption, the plaintiff's claim must be within the specific, individual hazard exception.

The *Cox* court then turned to the specific, individual hazard exception. *Id.* at 685. Citing *O'Bannon,* the *Cox* court held that weather conditions do not amount to a specific, individual hazard. *Id.* (citing *O'Bannon,* 960 F. Supp. at 1420–21). The *Cox* court emphasized, however, that the plaintiff admitted that it was not snowing at the time of the

accident and that there was good visibility. *Id.* Thus, the "weather [was] not discrete and truly local to this locality of West Virginia. In fact, this type of weather often exists during winter months all across West Virginia and most of the country." *Id.*

According to the *Cox* court, the "weather [was] not an aberration which the Secretary could not have practically considered when determining train speed limits under the FRSA, and weather conditions such as these are capable of being adequately encompassed within uniform, national standards." *Id.*

Finally, the *Cox* court cited public policy concerns. *Id.* The *Cox* court noted that if weather conditions could give rise to excessive speed claims, it "would pave the way for infinite state negligence lawsuits involving train accidents occurring in less than perfect weather." *Id.*

The *Cox* analysis on the specific, individual hazard exception question is problematic. With respect to the essentially local hazard exception, the *Cox* court ignores the actual statutory language of the exception ("essentially local hazard") in favor of the language in *Easterwood*, footnote 15 ("specific, individual hazard"). *Compare* 49 U.S.C § 20106(a)(2)(A), *with Easterwood*, 507 U.S. at 675 n.15, 113 S. Ct. at 1473 n.15. On its face, the statutory language "essentially local hazard" is at least arguably more expansive than the "specific, individual hazard" language in footnote 15. Further, the *Cox* court ignores the "such as" language in footnote 15. The "such as" language in footnote 15 clearly shows that state tort law claims related to slowing or stopping arising out of specific, individual hazards was merely an example of a claim that would not be preempted. The *Cox* court turned the example into a requirement. *See Cox*, 998 F. Supp. at 685. Finally, the *Cox* court emphasized that the local condition must be "unique." *Id.* But as noted in *Union Pacific*

*Railroad,* Congress rejected the requirement that a local hazard "uniquely" pose a safety hazard but instead declared an exception for "essentially" local safety hazards. 346 F.3d at 859.

The *Cox* court also analyzed whether excessive speed claims based on local weather conditions were "covered" by the Track Safety Standards regulations. *Cox,* 998 F. Supp. at 686. The *Cox* court recognized that there was authority on both sides of the issue. *Id.* The *Cox* court noted, however, that at the time of the accident, it was not snowing, not foggy, and there was good visibility. *Id.* at 687. To apply an exception where there were no visibility issues would be a result that "would swallow the federal regulations dealing with train speed" and be contrary to congressional desire to have national uniform rules "to the extent practicable." *Id.*

The determination by the *Cox* court that the regulation preempts claims over local weather condition because the Secretary could have promulgated a rule on the topic is not completely contrary to the *Bakhuyzen* decision. As discussed above, nothing in *Bakhuyzen* limits the power of the Secretary to engage in rulemaking related to climate condition. But silence on the issue in the Secretary's rules is insufficient to "cover" the "subject matter" of excessive speed based upon climate condition. Because climate condition is a concept that is fact based, and not rule based, it might be very difficult to fashion a sensible national rule of uniformity about a highly variable local condition.

The *Cox* case further observes that because climate issues are a frequent occurrence, a rule requiring trains to slow down based on visibility conditions would be a burden on interstate commerce. *Id.* at 688. Of course, truckers are subject to this kind of rule on Interstate highways.

No one thinks that requiring reasonable speeds on the Interstate highways is too much of a burden.

*Cox* is not contrary to *Bakhuyzen*, but it is distinguished from it. In any event, I regard *Cox* as flawed and unpersuasive.

**C.** *Seyler v. Burlington Northern Santa Fe Corp.* Weather was once again considered in *Seyler v. Burlington Northern Santa Fe Corp.* 102 F. Supp. 2d 1226 (D. Kan. 2000). In this case, the district court ruled that heavy rainfall producing flash flooding was not a specific, individual hazard under *Easterwood* footnote 15. *Id.* at 1237.

The *Seyler* court concluded that the heavy rainfall and resulting flash floods were preempted by the maximum speed provisions of the Track Safety Standards regulations. *Id.* at 1237–38. The *Seyler* court concluded that the majority of courts that have addressed the matter have regarded excessive speed claims due to climate conditions as preempted. *Id.* at 1236. The cited cases, however, rely upon the faulty assumption that the Track Safety Standards regulations specifically covered the issue of local weather conditions. The regulations did not. The *Seyler* court also asserted that most cases determined that local climate conditions were not specific, individual hazards under footnote 15 of *Easterwood*. *Id.* at 1236–37. But the language of the exception is an "essentially local hazard," which seems like an excellent description of the dense fog that was present at a railroad crossing in Black Hawk County on the morning of January 28, 2013.

**VII. Discussion of Merits of Claims.**

**A. Excessive Speed In Light of Weather Conditions.** The first question on the merits is whether the defendants were entitled to summary judgment on the first claim of excessive speed where there was intense fog

in the area of a railroad crossing. This matter is not free from doubt in light of the wiggles and wobbles of *Easterwood*.

I begin by emphasizing the purpose of the FRSA to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101 (2018). Astonishingly, this purpose rarely surfaces and is never seriously discussed in the lower federal court opinions dealing with FRSA preemption. It is generally ignored in favor of conclusory opinions declaring FRSA preemption in ambiguous situations where the purposes of the statute are not advanced. These cases essentially convert the "Federal Railroad Safety Act" into simply the "Federal Railroad Act."

The purpose of a statute cannot override unambiguous statutory provisions, of course, but it does play a role in powering the analysis of difficult areas of statutory interpretation. *Cipollone*, 505 U.S. at 517, 112 S. Ct. at 2618 (stating that when Congress has spoken on the issue of preemption, the analysis of structure and purpose is inappropriate); *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 98, 112 S. Ct. 2374, 2383 (1992) (stating that regardless of the form of preemption, the "ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole"). So a question to ask is whether a party's position on preemption furthers the statutory purpose of promoting safety and limiting accidents.

It is hard to see how preemption of excessive speed claims based upon climate condition promotes safety. The effect of preemption of an excessive speed claim based on the limited visibility caused by dense fog is that railroads are not required to slow down from maximum permitted speeds regardless of weather conditions. It's like saying there is nothing wrong with a trucker barreling along the interstate at seventy-five miles

per hour even if there is dramatically limited visibility. It is hard for me to see how that promotes safety. As noted in *Bakhuyzen*, "[m]aximum train speeds, like automobile speed limits, do not remove from the driver the obligation to exercise due care when and if the circumstances such as poor visibility due to snow make operation at the maximum speed careless." 20 F. Supp. 2d at 1118.

Aside from the issue that broad preemption of state tort law by the FRSA frustrates the safety purpose of the statute, there is the strong historical recognition of traditional historical police powers of the states in considering whether a federal statute preempts local law. *See Rice*, 331 U.S. at 230, 67 S. Ct. at 1152. Some of the lower federal court cases dealing with FRSA preemption are downright hostile to state tort law. Prior to the enactment of the FRSA, when there was no federal preemption, railroads were not ground to a halt by application of state tort law that promotes safety. Indeed, state tort law was thought to be, on its own, insufficient to promote the level of railroad safety that Congress desired. But to use preemption as a tool to gut state tort law that advances safety when the purpose of the statute is to promote safety in "all areas" when the relevant federal regulation does not address the subject is extraordinary. In other words, it is very difficult to understand how local state tort law related to reasonable speeds under the facts and circumstances is "covered" by the Track Safety Standards regulations establishing maximum speeds based on track conditions. By finding preemption of the excessive speed claim, the majority has federalized state tort law in a fashion that undermines the congressionally announced safety goal of the statute.

Contrary to some of the federal caselaw, there is no reason to believe that the Secretary considered weather conditions when it promulgated a

rule establishing maximum speeds based on track characteristics. None of the cases provide any citation to anything suggesting the contrary.

And the notion that the Secretary could promulgate a rule preempting state law related to excessive speeds under adverse climate conditions is beside the point. The FRSA expressly says that in order for state regulation to be preempted, the "subject matter" of the state regulation must be "covered" by the applicable federal regulation.

I recognize, of course, that the ambiguities in *Easterwood* could be (and have been) interpreted in a different fashion. But I would rather view the ambiguities in *Easterwood* as an opportunity to make the law more coherent and faithful to preemption precedents than to perpetuate and extend what I regard as mistaken interpretations. As a result, for the above reasons, I conclude that the excessive speed under the conditions claimed in this case is not preempted by the maximum speeds of the Track Safety Standards regulations promulgated by the Secretary pursuant to the FRSA. If the Secretary wants to preempt excessive speed claims like the one presented in this case, the Secretary may act by explicit regulation covering the "subject matter." But in light of the purpose of the statute and the caution to be applied in invoking preemption, I conclude the Track Safety Standards regulations deal with a different subject matter and therefore do not preempt the excessive speed claim in this case.

**B. Improper Lookout and Braking Claims.** With respect to the improper lookout and braking claims, I agree with the majority that summary judgment was appropriate on the unusual record developed in this case. Here, experts for both parties agreed that once the grader became visible to the train operators, there was nothing the operators could have done to avoid the accident. Of course, this conclusion, though

eliminating the plaintiffs' improper lookout and braking claims, would give support to the excessive speed claim.

## VI. Conclusion.

For the above reasons, I concur with the majority that the defendants are entitled to summary judgment on the plaintiffs' claims based on improper lookout and failure to brake. I dissent from the dismissal of the plaintiffs' claim that the defendants operated the train at excessive speed given the local condition of reduced visibility at a railroad crossing due to dense fog.